**Joseph C. KIRK, Appellee,**

v.

**Clayton RIDGWAY, Appellant.**

No. 84–1503.

Supreme Court of Iowa.

Aug. 21, 1985.

Philip A. Ostien of Davis, Grace, Harvey, Horvath, Gonnerman & Rouwenhorst, Des Moines, for appellant.

Melodee Hanes of Scalise, Scism, Sandre & Uhl, Des Moines, for appellee.

Considered by REYNOLDSON, C.J., and HARRIS, LARSON, SCHULTZ, and CARTER, JJ.

LARSON, Justice.

In 1973, Joseph G. Kirk bought a nearly-completed house from Clayton Ridgway, the contractor who had built, and owned, the house. Several years after the purchase, the exterior paint began to peel and parts of the house were repainted in 1976 and 1980. The peeling continued and, in 1981, Kirk was told by his painter that there was a problem with the original paint. Kirk related that information to Ridgway in 1981 but the matter remained unresolved.

Kirk brought an action against Ridgway in 1983, alleging breach of an implied warranty of "workmanlike" construction. In addition to the paint problem, Kirk also complained of defects in the driveway and the drywall on the inside of the house. The court granted summary judgment for the defendant as to the latter two problems but overruled it as to the complaints about the paint. The case went to trial solely on the question of whether the peeling of the paint constituted a breach of implied warranty.

The trial court found that the peeling was the result of "incompatibility" between the building materials used and the exterior paint. The court held this was a breach of the warranty to build the house "in a reasonably good and workmanlike manner," fit for the purpose intended, habitation. The only way of solving the problem, it concluded, was to remove and re-

place the siding and repaint. Judgment was entered against Ridgway, who appealed. We affirm.

I. *Should We Adopt the Implied Warranty of Workmanship in the Sale of Real Estate?*

In *construction* contracts there is an implied warranty that the building to be erected will be built in a reasonably good and workmanlike manner and that it will be reasonably fit for the intended purpose. *Busker v. Sokolowski,* 203 N.W.2d 301, 303 (Iowa 1972); *Markman v. Hoefer,* 252 Iowa 118, 123, 106 N.W.2d 59, 62 (1960); 17A C.J.S. *Contracts* § 329, at 292–94 (1963). This has long been the law of this state. *See e.g., Smith & Nelson v. Bristol,* 33 Iowa 24, 25 (1871) (contract to build house; warranty to construct in workmanlike manner implied).

But what if a prospective homeowner does not hire the builder to build the house but buys one from him already built? In that case the law in this state, and elsewhere, has not always treated the homeowner as well. In fact, older cases categorically observed that there were no implied warranties in the sale of real estate. *See e.g., Fegeas v. Sherrill,* 218 Md. 472, 476, 147 A.2d 223, 225 (1958) ("It is settled in most jurisdictions that there are no implied warranties in the sale of real estate."); *Kerr v. Parsons,* 83 Ohio App. 204, 208, 82 N.E.2d 303, 305 (1948) ("Ordinarily there is no implied warranty as to the condition of real estate sold or leased. . . ."); *Steiber v. Palumbo,* 219 Or. 479, 488–89, 347 P.2d 978, 982 (1959); *Dennison v. Harden,* 29 Wash.2d 243, 250, 186 P.2d 908, 912 (1947) ("[We] have found no cases, and appellant has cited none, which recognize that there is such a thing as implied warranty in the sale of real estate."); *See generally* Annot., 25 A.L.R.3d 383, 390–91 (1969).

The reason for distinguishing a construction contract from a contract or deed to a completed house was that, in the latter case, the doctrine of caveat emptor applied. The house, or other completed building, was there for inspection. A buyer who failed to make an adequate inspection, or to extract an express warranty from the seller, was just out of luck. During the reign of caveat emptor, it has been observed, courts considered purchasing as a game of chance. *See* Roberts, *The Case of the Unwary Home Buyer: The Housing Merchant Did It,* 52 Cornell L.Q. 835, 836 (1967).

Years ago, before the times of tract developments, prefabricated homes, and "spec" houses, the purchase of a new home in a completed stage was fairly rare. A prospective homeowner would usually purchase a lot, hire a draftsman to prepare the plans, and employ a builder to build the house. If the house turned out to be defectively designed, the owner looked to the person who designed it. If the house was improperly built, the owner looked to the builder. *See* Roberts, *supra,* at 837.

That scenario has, to a large extent, now changed. Recent cases and a considerable body of law review authority show that a combination of factors operating simultaneously have caused courts to balk at the continued application of the caveat emptor rule in the purchase of new homes.

First, as noted above, home-construction techniques have changed, from single-unit construction under the supervision of the owner, to the tract development commonly found today. Second, there has been an increasing interest in consumer protection, as evidenced by the trend toward recognizing implied warranty claims in the sale of personalty. *See Mease v. Fox,* 200 N.W.2d 791, 794 (Iowa 1972) (noted development of law in sale of personalty in adopting implied warranty of habitability in lease).

One writer has observed:

[T]he courts which have given relief to the purchaser of a new house sold by the contractor-vendor have preferred to put their theory of recovery on the breach of an implied warranty of "fitness for human habitation," where there was no express warranty. This seems entirely in accord with the better reasoned and for-

wardlooking decisions in other fields of warranty.

7 Williston on Contracts § 926A, at 813 (3d ed. 1963).

Last, increasing complexity in the houses themselves have made it more difficult for a buyer to discover defects in their construction. In large part the buyer must rely on the skill and judgment of the builder.

> When a vendee buys a development house from an advertised model ... he clearly relies on the skill of the developer and on its implied representation that the house will be erected in reasonably workmanlike manner and will be reasonably fit for habitation. He has no architect or other professional adviser of his own, he has no real competency to inspect on his own, his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaningful protective changes in the conveyancing documents prepared by the builder vendor is negligible. If there is improper construction such as a defective heating system or a defective ceiling, stairway and the like, the well-being of the vendee and others is seriously endangered and serious injury is forseeable. The public interest dictates that if such injury does result from the defective construction, its cost should be borne by the responsible developer who created the danger and who is in the better economic position to bear the loss rather than by the injured party who justifiably relied on the developer's skill and implied representation.

*Schipper v. Levitt & Sons, Inc.*, 44 N.J. 70, 91, 207 A.2d 314, 325–26 (1965).

One court has specifically noted the practical problems with the theory that a buyer may reasonably protect himself by inspecting the house. It said:

> Although considered to be a "real estate" transaction because the ownership to land is transferred, the purchase of a residence is in most cases the purchase of a manufactured product—the house. The land involved is seldom the prime element in such a purchase, certainly not in the urban areas of the state. The structural quality of a house, by its very nature, is nearly impossible to determine by inspection after the house is built, since many of the most important elements of its construction are hidden from view. The ordinary "consumer" can determine little about the soundness of the construction but must rely upon the fact that the vendor-builder holds the structure out to the public as fit for use as a residence, and of being of reasonable quality. Certainly in the case here no determination of the existence of the defect [settling of house] could have been made without ripping out the slab which settled, and maybe not even then. The home here was new and was purchased from the company which built it for sale. The defect here was clearly latent and not capable of discovery by even a careful inspection.... Common sense tells us that a purchaser under these circumstances should have at least as much protection as the purchaser of a new car, or a gas stove, or a sump pump, or a ladder.

*Smith v. Old Warson Development Company*, 479 S.W.2d 795, 799 (Mo.1972) (en banc).

We believe that a purchaser of a new home from a builder-vendor should be protected against latent defects in the home and that our law of real estate should accommodate a rule of implied warranty commensurate with our law of consumer protection in other areas. This is clearly the trend of the law, if not already the majority rule. *See* Corbin on Contracts § 686A, at 837 (Kaufman Supp.1984); 7 Williston on Contracts § 926A, at 802.

> Over the years, the number of cases which apply the rule of caveat emptor strictly appears to be diminishing, while there is a distinct tendency to depart therefrom, either by way of interpretation, or exception, or by simply refusing to adhere to the rule where it would work injustice.

7 Williston on Contracts § 686A, at 802. *See generally* Annot., 25 A.L.R.3d at 391;

*Smith,* 479 S.W.2d at 801 (list of cases and law review articles in support of implied warranty applications); *McDonald v. Mianecki,* 79 N.J. 275, 285–88, 398 A.2d 1283, 1288–91 (1979) (same).

The Uniform Land Transactions Act (which Iowa has not yet adopted) reflects the current trend. It provides in part that an implied warranty will cover all purchases from "seller[s] in the business of selling real estate." The warranty, under that act, applies to all real estate, not just houses, and warrants that the building will be "suitable for the ordinary uses of real estate of its type" and is (1) free from defective material and (2) constructed in accordance with applicable law, according to sound engineering and construction standards, and in a workmanlike manner. *See* Uniform Land Transactions Act, § 2–309, 13 U.L.A. at 609–10 (1980).

A review of cases from other jurisdictions reveals that the rule of implied warranty in the sale of houses is now the clearly prevailing view. *See e.g. Sims v. Lewis,* 374 So.2d 298 (Ala.1979) (defective septic system); *Wawak v. Stewart,* 247 Ark. 1093, 449 S.W.2d 922 (1970) (improper installation of heating and air conditioning duct work causing rain to seep into house); *Pollard v. Saxe & Yolles Development Co.,* 12 Cal.3d 374, 525 P.2d 88, 115 Cal. Rptr. 648 (1974) (structural defects in walls, doors and adequate drainage); *Carpenter v. Donohoe,* 154 Colo. 78, 388 P.2d 399 (1964) (basement walls cracked; living in house characterized as "dangerous"); *Berman v. Watergate West, Inc.,* 391 A.2d 1351 (App.D.C.1978) (leaks in basement and large cracks in three basement walls); *Hesson v. Walmsley Construction Co.,* 422 So.2d 943 (Fla.Dist.Ct.App.1982) (cracks developed in house from settling); *Bethlahmy v. Bechtel,* 91 Idaho 55, 415 P.2d 698 (1966) (old irrigation ditch caused water seepage to basement walls washing away support for garage floor); *Conyers v. Molloy,* 50 Ill.App.3d 17, 7 Ill.Dec. 695, 364 N.E.2d 986 (1977) (defective attic ventilation causing water damage); *Theis v. Heuer,* 264 Ind. 1, 280 N.E.2d 300 (1972) (defective sewer lines; sewage backed into

house to depth of three to four inches); *Borden v. Litchford,* 619 S.W.2d 715 (Ky. Ct.App.1981) (nature of defect not clear in opinion; remand, however, limited to consideration of structural defects); *Banville v. Huckins,* 407 A.2d 294 (Me.1979) (basement flooded to ten inches and house water unusable); *Loch Hill Construction Co. v. Fricke,* 284 Md. 708, 399 A.2d 883, (1979) (water unfit for consumption); *Weeks v. Slavic Builders, Inc.,* 24 Mich.App. 621, 180 N.W.2d 503, *aff'd* 384 Mich. 257, 181 N.W.2d 271 (1970) (defective roof caused interior water damage); *Smith,* 479 S.W.2d 795 (Mo.1972) (slab settled under part of house); *Ruane v. Cardinal Realty, Inc.,* 116 N.H. 321, 358 A.2d 412 (1976) (drinking water unfit for use); *McDonald,* 79 N.J. 275, 398 A.2d 1283 (1979) (water not useable); *Hartley v. Ballou,* 286 N.C. 51, 209 S.E.2d 776 (1974) (two and one-half feet of water in basement caused by undersized storm sewer); *Tibbs v. National Homes Construction Corp.* 52 Ohio App.2d 281, 369 N.E.2d 1218 (1977); *Jeanguneat v. Jackie Hames Construction Co.,* 576 P.2d 761 (Okla.1978) (unusable well water); *Forbes v. Mercado,* 283 Or. 291, 583 P.2d 552 (1978) (water unusable); *Elderkin v. Gaster,* 447 Pa. 118, 288 A.2d 771 (1972) (undrinkable water); *Terlinde v. Neely,* 275 S.C. 395, 271 S.E.2d 768 (1980) (house settled); *Waggoner v. Midwestern Development, Inc.,* 83 S.D. 57, 154 N.W.2d 803 (1967) (water seepage into basement); *Humber v. Morton,* 426 S.W.2d 554 (Tex. 1968) (defective fireplace causing house fire); *Rothberg v. Olenik,* 128 Vt. 295, 262 A.2d 461 (1970) (foundation cracking); *House v. Thornton,* 76 Wash.2d 428, 457 P.2d 199 (1969) (soil unstable; house "unfit for occupancy."); *Fisher v. Simon,* 15 Wis.2d 207, 112 N.W.2d 705 (1961) (defective backfilling caused walls to crack and water to enter basement).

We noted the trend toward the adoption of implied warranties in the purchase of houses in *Gosha v. Woller,* 288 N.W.2d 329, 331, n. 3 (Iowa 1980), but concluded the issue had not been properly raised. In an analogous case, *Mease v. Fox,* 200

N.W.2d 791 (Iowa 1972), we adopted the implied warranty of workmanship in the lease of a house. We said that

> the rationale of the [cited] cases justifies departure from the antiquated concept of caveat emptor and impels recognition of an implied warranty of habitability—at least to the extent of freedom from latent defects and material violations of housing code requirements—in either the oral or written lease of a dwelling, including a house, condominium or apartment.

*Id.* at 796.

We believe recognition of the implied warranty of workmanship in the sale of a home by a builder-vendor is a logical extension of *Mease.* It is also consistent with our cases, such as *Busker,* 203 N.W.2d at 303, and its predecessors which have recognized such warranties in construction contracts.

■ For these reasons, we conclude that, in the sale of a home, there is an implied warranty that it has been constructed in a reasonably good and workmanlike manner and that it will be reasonably fit for its intended purposes. In addressing the question whether the trial court correctly applied the concept under the facts of this case, we look to the elements of such a warranty which are generally recognized to be as follows:

(1) That the house was constructed to be occupied by the warrantee as a home;

(2) that the house was purchased from a builder-vendor, who had constructed it for the purpose of sale;

(3) that when sold, the house was not reasonably fit for its intended purpose or had not been constructed in a good and workmanlike manner;

(4) that, at the time of purchase, the buyer was unaware of the defect and had no reasonable means of discovering it; and

(5) that by reason of the defective condition the buyer suffered damages.

*See Sims,* 374 So.2d at 303; *Theis,* 264 Ind. at 7, 280 N.E.2d at 303. *Cf. Busker,* 203 N.W.2d at 303.

For the reasons discussed later, we believe the evidence supports the trial court's finding that each of the elements was established.

■ As in other warranty cases, of course, notice of an alleged breach must be given within a reasonable time after the claimant discovers, or should have discovered, the breach. *See Mease,* 200 N.W.2d at 797; *Pollard,* 12 Cal.3d at 380, 525 P.2d at 92, 115 Cal.Rptr. at 652; *Wagner Construction Co. v. Noonan,* 403 N.E.2d 1144, 1149 (Ind.Ct.App.1980).

■ The term "builder-vendor," for purposes of this rule, has been defined as:

> [A] person who is in the business of building or assembling homes designed for dwelling purposes upon land owned by him, and who then sells the houses, either after they are completed or during the course of their construction, together with the tracts of land upon which they are situated, to members of the buying public.

> The term "builder" denotes a general building contractor who controls and directs the construction of a building, has ultimate responsibility for a completion of the whole contract and for putting the structure into permanent form thus, necessarily excluding merchants, material men, artisans, laborers, subcontractors, and employees of a general contractor.

*Jeanguneat,* 576 P.2d at 762, n. 1. *Cf.* Uniform Land Transactions Act, § 2–309, 13 U.L.A. at 609–10 (implied warranty applies only to a vendor "in the business of selling real estate.") We adopt the definition of the *Jeanguneat* case for purposes of applying our own rule of implied warranty.

II. *Should an Implied Warranty be Recognized Under These Facts?*

Ridgway argues that, even if we were to adopt the principles of implied warranty under other circumstances, it should nevertheless not be applied to this case.

(1) Ridgway first claims the purpose of the implied warranty is to protect a buyer

who is bargaining from a position of weakness. Kirk had been a real estate salesman for many years prior to this purchase, and he had inspected a great number of new houses. To Kirk, the purchase of a house was "an everyday transaction" and he did not fall into the category of buyers who needed protection, according to Ridgway. In effect, he argues that caveat emptor applies under these circumstances.

 Being a real estate salesman, however, did not make Kirk an expert on paint-wood bonding. At the time he bought the house there were no signs of the problem. Even after the peeling had become apparent, the expert witnesses testifying at trial could not agree on what caused it. (The defendant's witness opined it was caused by the paint used by Kirk in the repainting projects in 1976 and 1980). Kirk lacked the knowledge that there was a problem and the expertise to determine its cause. We therefore reject Ridgway's argument.

(2) Ridgway also raises a "merger" argument. When Kirk took title to the property without any reservation of warranty, he lost it, according to this argument. We believe the Texas supreme court aptly dealt with this argument when it said

> [i]t would be a strange doctrine indeed for the law to raise an implied warranty from a sale and then recognize that such warranty could be defeated by the passage of title to the subject matter of the sale.

*Humber*, 426 S.W.2d at 556; *accord Banville*, 407 A.2d at 296. We reject this argument also.

(3) Ridgway also raises an issue of Kirk's failure to give timely notice of the alleged defect. He argues that Kirk knew of the defect in the spring of 1981 but failed to notify him of it until April 1982. Reasonableness of a notice is ordinarily a fact issue. In order to reverse on the issue of notice, we would have to conclude that no rational fact finder could conclude that approximately a year between knowledge of the defect and a notification to Kirk was a reasonable time. This we cannot do.

(4) Ridgway raises other issues which, we believe, are foreclosed by our substantial evidence rule. Specifically, he argues there is insufficient evidence of the breach of warranty and insufficient evidence to support the award of damages. We agree there was credible evidence that Kirk's problem was not caused by a construction defect, and credible evidence that the award of damages was excessive. The question, however, is whether there was substantial evidence to support the findings which the court actually made, not those which it could have made. We conclude there was substantial evidence to support these findings.

We find no basis for reversal.

AFFIRMED.