# IN THE SUPREME COURT OF IOWA

No. 13–0060

Filed December 12, 2014

Amended February 23, 2015

**LUANA SAVINGS BANK,**

Appellant,

vs.

**PRO-BUILD HOLDINGS, INC.** and **UNITED BUILDING CENTERS,**

Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Allamakee County, John J. Bauercamper, Judge.

Lender acquiring apartment buildings by deed in lieu of foreclosure seeks further review of court of appeals decision affirming summary judgment that dismissed claim against builder under implied warranty of workmanlike construction. **DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED.**

Dale L. Putnam of Putnam Law Office, Decorah, for appellant.

Samuel C. Anderson of Swisher & Cohrt, P.L.C., Waterloo, for appellees.

**WATERMAN, Justice.**

In this interlocutory appeal, we must decide whether to extend the implied warranty of workmanlike construction to protect a bank that acquired a mold-infested apartment complex by deed in lieu of foreclosure. The bank sued the builder under that theory, alleging shoddy construction. This implied warranty "is a judicially created doctrine implemented to protect an innocent home buyer by holding the experienced builder accountable for the quality of construction." *Speight v. Walters Dev. Co.*, 744 N.W.2d 108, 110 (Iowa 2008). In *Speight*, we extended the doctrine to allow a subsequent purchaser of a single-family residence to sue the builder for latent defects. *Id. at* 113–14.[1] The plaintiff bank argues it is in a position analogous to a subsequent homeowner. The district court disagreed and granted the builder's motion for summary judgment dismissing that theory. The court of appeals affirmed, appropriately deferring to our court to decide whether to further extend this implied warranty.

We hold the bank may not recover under the implied warranty of workmanlike construction. No other court has extended the theory to allow claims by foreclosing lenders. Additionally, a clear majority of courts decline to allow recovery by for-profit owners of apartment buildings. The doctrine's rationale does not support extending it to the bank. We created the doctrine to redress the disparity in bargaining power and expertise between homeowners and professional builders, and to provide a remedy for consumers living in defectively constructed

---

[1]In *Rosauer Corp. v. Sapp Development, L.L.C.*, decided today, we further explore the history and rationales for the implied warranty of workmanlike construction and decline to extend the doctrine to the sale of lots between developers. 856 N.W.2d 906 (Iowa 2014).

homes. We see no valid policy reason to extend the implied warranty doctrine to a sophisticated financial institution that can protect itself through other measures. Accordingly, we affirm the summary judgment dismissing the bank's implied warranty theory.

## I. Background Facts and Proceedings.

This litigation arose from the discovery of black mold infesting two apartment buildings in Postville, Iowa. Luana Savings Bank (bank) financed the construction of the buildings. The borrowers, Ronald Wahls and Karen Wahls, acting as officers of RO-KA Acres, Inc. (RO-KA), purchased farmland to develop into the RO-KA Heights First Addition in 2002. The bank financed their purchase through a line of credit secured by an open-ended mortgage. RO-KA subdivided the land into twenty-one lots and sold nine lots to various buyers over the next several years. In May of 2006, the bank filed a foreclosure action against RO-KA for amounts due on promissory notes.

On July 1, RO-KA entered into a real estate contract with Amereeka Properties, LLC (Amereeka) conveying its remaining interest in the RO-KA Heights Addition in exchange for a purchase price of $1,231,000. This land included lots 15 and 16, at issue in this case. The agreement between Amereeka and RO-KA contained provisions assigning all payments on the purchase price to the bank until RO-KA's indebtedness to the bank was satisfied. In exchange, the bank agreed to dismiss the foreclosure action. Amereeka's president was Shalom Rubashkin, an owner of Agriprocessors Inc., a kosher meatpacking plant. The bank's chief financial officer, Collin Cook, testified he understood Amereeka was formed to avoid the perception that Rubashkin owned the apartment buildings where many employees of Agriprocessors lived.

RO-KA and Amereeka entered into a separate management agreement. RO-KA agreed to manage the existing apartment complexes on lots 12 and 13 of RO-KA Heights, as well as any other apartments to be built on the land. At this time, lots 15 and 16 were undeveloped. On July 28, Ronald Wahls entered into a written contract for materials and labor with United Building Centers (UBC), the predecessor of Pro-Build Holdings, Inc. (Pro-Build), to construct two twelve-plex apartment buildings on lots 15 and 16. Wahls signed the contract in his own name instead of as an agent for RO-KA or Amereeka. The plans for construction were based on the floor plans of the existing apartment complexes. Construction began in 2006 and was completed in 2007. RO-KA managed the new buildings under its existing management agreement. Amereeka executed an open-ended mortgage on the property it had purchased from RO-KA in favor of the bank. Amereeka also executed a commercial security agreement securing a commercial real estate loan made by the bank to Nevel Properties, Inc., Amereeka's parent company. The proceeds of that loan were used to pay for the construction of the apartment buildings on lots 15 and 16.

On May 12, 2008, federal immigration and customs enforcement (ICE) agents raided Agriprocessors and arrested nearly 400 undocumented workers who were charged with a variety of immigration-related criminal offenses. *United States v. Rubashkin*, 718 F. Supp. 2d 953, 964 (N.D. Iowa 2010). On November 4, Agriprocessors filed a bankruptcy petition, and its assets ultimately were sold. *Id.* at 966–67. Rubashkin was indicted for bank fraud and other financial and immigration crimes, convicted, and sentenced to prison. *United States v. Rubashkin*, 655 F.3d 849, 854–55 (8th Cir. 2011).

In 2009, both RO-KA and Amereeka defaulted on their obligations to the bank. RO-KA quitclaimed its interest in the properties at RO-KA Heights to the bank in February of 2009 in exchange for a release of its remaining obligations to the bank. On June 26, Amereeka gave the bank a "Deed in Lieu of Foreclosure" signed by Rubashkin conveying all of the property it owned in RO-KA Heights to the bank as a release from liability under the mortgage, including lots 15 and 16. After acquiring ownership in the apartment complexes, the bank discovered substantial black mold in the units. Investigation revealed that the mold resulted from improper installation of windows and air-conditioning units, and inadequate attic ventilation.

The bank commenced this action by filing a petition against Pro-Build in Allamakee County. Count I of the petition alleged negligence in the construction of apartments for Amereeka. Count II alleged that Pro-Build breached the implied warranty of workmanlike construction. Count III alleged that Pro-Build breached an oral contract with Amereeka for the construction of the apartments. The bank sought recovery of its holding costs as well as the cost of repairs to remediate the mold. Pro-Build moved for summary judgment on all three counts. The district court granted summary judgment in favor of Pro-Build on counts I[2] and II, but denied summary judgment on count III to determine if the bank was a third-party beneficiary of Wahls' contract with UBC. The bank applied for an interlocutory appeal of the summary judgment on count II. Pro-Build resisted the application and conditionally applied for interlocutory appeal of the order denying summary judgment on count

---

[2]The bank does not challenge the order dismissing count I, its negligence theory. Accordingly, the economic loss doctrine is not at issue in this appeal.

III. We granted both applications and transferred the case to the court of appeals. The court of appeals affirmed the summary judgment dismissing the implied warranty claim, reversed the order denying summary judgment on the third-party beneficiary theory, and remanded the case for entry of judgment of dismissal against the bank. We granted further review to decide whether to extend the implied warranty of workmanlike construction to a lender acquiring multiplex apartment buildings by deed in lieu of foreclosure.

## II. Scope of Review.

We review rulings that grant summary judgment for correction of errors at law. *Parish v. Jumpking, Inc.*, 719 N.W.2d 540, 542 (Iowa 2006). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3). We view the evidence in the light most favorable to the nonmoving party. *Parish*, 719 N.W.2d at 543.

On further review, we have discretion to choose which issues to address. *Hills Bank & Trust Co. v. Converse*, 772 N.W.2d 764, 770 (Iowa 2009). We exercise our discretion to limit our review to the implied warranty of workmanlike construction. The court of appeals decision on the third-party-beneficiary claim shall stand as the final appellate decision on that issue. *See id.*

## III. Analysis.

We must decide whether to extend the implied warranty of workmanlike construction to a lender that acquires a multiunit residential apartment complex by a deed in lieu of foreclosure. This is a question of first impression in Iowa. We conclude the bank's implied warranty claim fails for several reasons. First, the bank is not the type of innocent homeowner the implied warranty was adopted in Iowa to

protect. Second, Pro-Build is not the type of builder-vendor subject to the implied warranty. Third, the requested extension to a foreclosing lender is not supported by caselaw in other jurisdictions. Finally, the policy reasons underlying the implied warranty do not support its extension to a foreclosing lender.

The implied warranty of workmanlike construction adopted for the protection of homeowners in our state was an extension of *Mease v. Fox*, 200 N.W.2d 791, 796 (Iowa 1972),[3] which adopted an implied warranty of habitability for a tenant leasing a home. *See Kirk v. Ridgway*, 373 N.W.2d 491, 496 (Iowa 1985) (describing the adoption of the implied warranty for homeowners as a "logical extension" of *Mease*). In *Kirk*, we required proof "the house was constructed to be occupied by the [plaintiff] warrantee as a home." *Id.* We extended the warranty to subsequent home purchasers in *Speight*, 744 N.W.2d at 113–14. In *Rosauer Corp. v. Sapp Development*, decided today, we explore in more depth the history of the implied warranty of workmanlike construction in Iowa and the policy reasons supporting the doctrine. 856 N.W.2d 906, 908 (Iowa 2014) (declining to extend the doctrine to the sale of a lot without a dwelling). We reiterated that the primary policy behind these warranties is the protection of innocent homeowners as consumers. *Id.* We adopted the warranty to address the disparity in bargaining power and expertise between the consumer and the sophisticated builder-vendor. *Id.* The bank's effort to recover from Pro-Build under this

---

[3]The common law implied warranty of habitability judicially adopted in *Mease* to protect tenants has been legislatively codified by the Uniform Residential Landlord and Tenant Act, Iowa Code chapter 562A. *See Crawford v. Yotty*, 828 N.W.2d 295, 299 (Iowa 2013).

implied warranty as a foreclosing lender is akin to trying to pound a square peg into a round hole.

**A. The Elements of the Implied Warranty Theory in Iowa.** In *Kirk*, we adopted the following "generally recognized" elements for the implied warranty of workmanlike construction:

> (1) That the house was constructed to be occupied by the warrantee as a home;
>
> (2) that the house was purchased from a builder-vendor, who had constructed it for the purpose of sale;
>
> (3) that when sold, the house was not reasonably fit for its intended purpose or had not been constructed in a good and workmanlike manner;
>
> (4) that, at the time of purchase, the buyer was unaware of the defect and had no reasonable means of discovering it; and
>
> (5) that by reason of the defective condition the buyer suffered damages.

*Kirk*, 373 N.W.2d at 496; *see also Rosauer*, 856 N.W.2d at 909–10 (applying same elements to reject extension of implied warranty to developer's purchase of lot without dwelling). The bank asks us to eliminate or modify the first and second elements of the implied warranty of workmanlike construction currently recognized in Iowa. We decline to do so.

1. *The house was constructed to be occupied by the plaintiff-warrantee as a home.* The first element limits the potential class of plaintiffs to innocent home buyers for whose benefit we created the warranty. *See Kirk*, 373 N.W.2d at 496. The bank does not occupy either building as its home or office. The bank instead argues that the apartment complex is comprised of multiple residences for the tenants who live there. The bank, however, does not purport to bring implied warranty claims on behalf of the tenants. Nor does the bank seek

recovery based on any assignment of an implied warranty claim of the occupants or purchaser. We have never allowed an implied warranty claim to be brought by a lender that has succeeded to ownership. We are not persuaded to abandon the first element of the *Kirk* test to allow recovery by the bank. *See Rosauer*, 856 N.W.2d at 910 (declining to extend the implied warranty beyond innocent home buyers who live in the defective structure).

2. *The defendant must be a builder-vendor constructing homes on land it owns for resale.* Just as the first element limits the class of potential plaintiffs, the second element of the *Kirk* test limits the class of potential defendants to builder-vendors who own the structures they build to sell on land they own. In *Kirk*, we adopted the following definition for the term "builder-vendor":

> "[A] person who is in the business of building or assembling homes designed for dwelling purposes upon land owned by him, and who then sells the houses, either after they are completed or during the course of their construction, together with the tracts of land upon which they are situated, to members of the buying public.
>
> The term 'builder' denotes a general building contractor who controls and directs the construction of a building, has ultimate responsibility for a completion of the whole contract and for putting the structure into permanent form thus, necessarily excluding merchants, material men, artisans, laborers, subcontractors, and employees of a general contractor."

*Kirk*, 373 N.W.2d at 496 (quoting *Jeanguneat v. Jackie Hames Constr. Co.*, 576 P.2d 761, 762 n.1 (Okla. 1978)). Other jurisdictions have adopted essentially the same definition. *See Elderkin v. Gaster*, 288 A.2d 771, 774 n.10 (Pa. 1972) ("A builder-vendor . . . refers to one who buys land and builds homes upon that land for purposes of sale to the general public."); *Frickel v. Sunnyside Enters., Inc.*, 725 P.2d 422, 424–25 (Wash.

1986) (en banc); *Bagnowski v. Preway, Inc.*, 405 N.W.2d 746, 750 (Wis. Ct. App. 1987).

We reaffirmed *Kirk*'s definition of builder-vendor in *Flom v. Stahly*, 569 N.W.2d 135 (Iowa 1997). In *Flom*, a defendant physician and his wife began construction of a home on land they owned, intending to live in it. *Id.* at 137. Before completing construction, the Stahlys moved out of state and sold the uncompleted home to the Floms. *Id.* at 137–38. When wood in the home began to rot, the Floms sued for breach of the implied warranty of workmanlike construction, among other claims. *Id.* at 138–39. We rejected this extension of *Kirk* because the Stahlys did not meet the second element of the *Kirk* test—they were not builder-vendors building a home for the purpose of sale to the public. *Id.* at 142. Because they intended to live in the house themselves and had never built a home before, the Stahlys did not have the same unequal relationship with the Floms that a professional builder-vendor would have with a purchaser.

The bank argues our extension of the implied warranty to subsequent purchasers in *Speight* supports a further extension in this case. Although *Speight* expanded the class of plaintiffs permitted to sue for breach of implied warranty to encompass later home buyers, it did not expand the permissible defendants beyond traditional builder-vendors. As an Illinois appellate court recognized, precedent relaxing the privity requirement to allow a subsequent homeowner to bring the implied warranty claim did not support expanding the types of defendants liable under the doctrine. *Wash. Courte Condo. Ass'n-Four v. Wash.-Golf Corp.*, 501 N.E.2d 1290, 1296 (Ill. App. Ct. 1986) (holding as matter of law owners' implied warranty claim failed against subcontractors when general contractor was solvent).

Pro-Build argues that it is not a builder-vendor under *Kirk* and *Flom* and, therefore, cannot be a defendant in an implied warranty case. We agree. Ronald Wahls approached Pro-Build's predecessor UBC with a set of plans modeled after the existing apartments on lots 11 and 12. The contract between UBC and Wahls was entitled "Contract Agreement for Materials & Labor" and never referred to UBC as a general contractor. Neither UBC nor Pro-Build owned the land on which the construction took place, nor did either build the multiplexes to sell to the public. Rather, UBC was paid directly for its work by Wahls, who acted as the developer on behalf of Amereeka to construct the apartments and exercised control over the course of construction. Missing from this case is the disparity in bargaining power and expertise between the parties that motivated us in *Kirk* and *Speight* to allow recovery under the implied warranty theory. *See Rosauer*, 856 N.W.2d at 910. We decline the bank's invitation to eliminate or modify the second element of the *Kirk* test. The bank's implied warranty claim fails because Pro-Build was not a builder-vendor as defined in *Kirk*.

**B. Caselaw from Other Jurisdictions.** In *Kirk*, we examined the caselaw of other jurisdictions to decide whether to adopt the implied warranty of workmanlike construction in the sale of single-family residences. 373 N.W.2d at 495. In *Speight*, we again surveyed the caselaw of other jurisdictions to decide whether to extend the implied warranty to subsequent purchasers of a single-family home. 744 N.W.2d at 111–14. Similarly, we will now survey the cases from other states that adjudicate whether to recognize the implied warranty in the sale of multiunit apartment complexes when the plaintiff is not purchasing the property to live in it.

The bank cites no decision from any jurisdiction extending the implied warranty of workmanlike construction to a lender acquiring property by deed in lieu of foreclosure. Nor have we found such a decision in our independent research.[4] Moreover, courts in other states are divided on whether to extend the implied warranty to investment property or multiunit apartment complexes.

Most jurisdictions that have considered the issue have limited the implied warranty remedy to purchasers who actually live on the premises. *See, e.g.*, *Hopkins v. Hartman*, 427 N.E.2d 1337, 1339 (Ill. App. Ct. 1981) (concluding that an investor in income-producing property has different pressures than a home buyer and should not be protected by an implied warranty); *Korte Constr. Co. v. Deaconess Manor Ass'n*, 927 S.W.2d 395, 405 n.4 (Mo. Ct. App. 1996) (noting the "implied warranty of habitability applies only to newly-constructed houses [and that t]he development in this case is more akin to an apartment complex than a house" (citation omitted)); *Sedona Condo. Homeowners Ass'n, Inc. v. Camden Dev., Inc.*, No. 57052, 2012 WL 6681941, at *2 n.2 (Nev. 2012) (declining to extend implied warranty to builder-vendors of apartment complexes); *Hays v. Gilliam*, 655 S.W.2d 158, 160–61 (Tenn. Ct. App. 1983) ("[T]he purchaser of an apartment house is not a 'naive home buyer', but an investor in a commercial enterprise."); *Frickel*, 725 P.2d at 425 (declining to extend implied warranty to an investor in an apartment

---

[4]In *Amsterdam Savings Bank, FSB v. Marine Midland Bank, N.A.*, a bank, as mortgagee, acquired an apartment complex by foreclosure and sued the builder under several theories including breach of implied warranty. 504 N.Y.S.2d 563, 565 (App. Div. 1986). However, New York law at that time did not recognize the implied warranty of workmanlike construction, and the action was dismissed because the sale of a mortgage was not a "sale of goods" under New York law. *Id.*

complex because an investor has an opportunity to inspect and investigate).

Some jurisdictions have allowed owners of condominiums who reside in the units to bring suit either as an association or individually. *See, e.g.*, *Lofts at Fillmore Condo. Ass'n v. Reliance Commercial Constr., Inc.*, 190 P.3d 733, 736–37 (Ariz. 2008) (en banc) (allowing a condominium association to serve as a plaintiff on behalf of purchasers of condominiums); *Herlihy v. Dunbar Builders Corp.*, 415 N.E.2d 1224, 1225 (Ill. App. Ct. 1980) (allowing the owner of one condominium to bring suit on behalf of all similarly situated unit owners). These cases are distinguishable because the bank is not a purchaser living in the property.

The *Hopkins* court elaborated on the distinction between buying a home to live in and purchasing a multiunit dwelling for profit:

> The motivations upon those seeking income-producing property, as well as the pressures upon them, are considerably different from those of the vendee described in *Petersen* [*v. Hubschman Construction Co.*, 389 N.E.2d 1154 (1979)]. The income-seeker, whether he be purchasing common stocks, chattels, real estate, or any other form of investment, has ample opportunity to investigate, study, appraise and assess the relative merits and demerits of the subject matter and then to make a calculated judgment as to how profitable it will be. In contrast, the *Petersen* vendee is seeking shelter for himself and his family, oftentimes under considerable pressure brought about by job transfer, increase in family, deterioration of his former neighborhood, or other circumstance over which he has no control. If the *Petersen* warranty is to be extended to an investor in real estate, by extension of logic the Board of Governors of the New York Stock Exchange should warrant that no common stock traded there will ever decrease in value. The relaxation of the rules of caveat emptor and merger by the supreme court was intended to protect a consumer, not an investor.

427 N.E.2d at 1339. We are persuaded by this distinction between purchasers of income-producing properties and home buyers who live in

the property. The bank does not purport to bring implied warranty claims by or through the residents of the multiplexes. Under the majority rule, the bank cannot recover under the implied warranty theory.

Several courts have extended the implied warranty of workmanlike construction to buyers of commercial property. *See Pollard v. Saxe & Yolles Dev. Co.*, 525 P.2d 88, 91 (Cal. 1974) (extending implied warranty for new construction to purchasers of an apartment complex); *Tusch Enters. v. Coffin*, 740 P.2d 1022, 1031–32 (Idaho 1987) (extending an implied warranty of habitability to residential dwellings purchased for income-producing purposes but never occupied by the buyers); *Hodgson v. Chin*, 403 A.2d 942, 945 (N.J. Super. Ct. App. Div. 1979) (extending implied warranty of fitness for intended purpose to a buyer of a small building when the building was in part a residential space and in part a commercial space); *cf. Davidow v. Inwood N. Prof'l Grp.—Phase I*, 747 S.W.2d 373, 376–77 (Tex. 1988) (extending an implied warranty of suitability in commercial leases analogous to implied warranty of habitability in a residential lease).

*Tusch Enterprises*, decided by a divided Idaho Supreme Court, explicitly extended the implied warranty to investors buying apartment buildings for income-producing purposes. 740 P.2d at 1031.[5] The

---

[5]In *Speight*, we quoted a commentator who in turn quoted *Tusch Enterprises* for an entirely different proposition, as follows:

> Further, the purpose of the implied warranty of workmanlike construction is to ensure the home " 'will be fit for habitation,' a matter that 'depends upon the quality of the dwelling delivered' not the status of the buyer." [Mary Dee] Pridgen, [*Consumer Protection and the Law,*] § 18:19 [(2006)] (quoting *Tusch Enters. v. Coffin,* 113 Idaho 37, 740 P.2d 1022 (1987)).

*Speight*, 744 N.W.2d at 113. In *Speight*, we extended the implied warranty to a subsequent purchaser who lived in the home. *Id.* at 114. We noted other jurisdictions

majority in *Tusch Enterprises* cited no caselaw supporting that extension, instead reasoning by analogy to the Uniform Commercial Code's use of implied warranties on the sale of goods between merchants. *Id.* The dissent would have declined to extend the warranty to investors purchasing income-producing commercial properties. *Id.* at 1039 (Shepard, C.J., dissenting). The dissent criticized the majority for taking an "enormous step . . . which will resound through the construction and real estate business in Idaho." *Id.* at 1037. For the dissent, the relative sophistication of the parties was a crucial distinction. *Id.* at 1038 ("The plaintiffs in this case . . . are not unknowing buyers of a residence built by an unscrupulous builder/developer. Rather, plaintiffs are a sophisticated and knowledgeable group of investors in real estate."). The dissent described investors in income-producing property as a "far cry" from the ordinary buyer of a new house that the implied warranty was adopted to protect. *See id.* at 1038–39. We agree with that distinction. Since *Tusch Enterprises* was decided in 1987, no other court has followed it to extend the protection of the implied warranty of habitability to investors purchasing apartment buildings for income-producing purposes, much less to foreclosing lenders. Even the *Tusch Enterprises* majority opinion did not extend the implied warranty to a bank acquiring apartment buildings by a deed in lieu of foreclosure, as the bank asks us to do today.

There are several reasons not to extend the implied warranty to lenders. For one thing, as far as the lender is concerned, the property is

---

extended the implied warranty to subsequent purchasers. *Id.* at 112 n.2 (citing numerous cases including *Tusch Enterprises*). But, we extended the protection of the implied warranty to home buyers living in the defectively built house, not investors purchasing apartment buildings as income-producing property.

not the lender's return on the transaction; it serves only as the collateral securing repayment of a loan. A defective dwelling is not the same problem for the lender that it is for the homeowner living in it so long as the borrower can repay the loan. Moreover, lenders can protect themselves in a variety of ways. For example, in this case, the bank could have stated in the loan documents that, upon default, all claims of Wahls against other parties (such as Pro-Build) would be assigned to the bank. *See Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 533 (Iowa 1995) (recognizing assignability of causes of action). A lender presumably could obtain a default judgment against its borrower and proceed to levy on his cause of action. *See Steffens v. Am. Standard Ins. Co. of Wis.*, 181 N.W.2d 174, 176 (Iowa 1970) ("Iowa has adopted the broad form of statutory execution authorizing levy on choses in action."). At oral argument, the bank's counsel explained that Wahls filed for bankruptcy, but did not explain why the bank did not attempt to obtain Wahls' cause of action against Pro-Build in that bankruptcy proceeding, either by purchasing the asset for a nominal amount or by convincing the trustee to abandon it. *See* 11 U.S.C. § 554 (2012). A lender financing construction could arrange inspections[6] or purchase warranties. In this

---

[6]In oral argument, counsel for the bank suggested that a lender that inspected construction work or approved plans could open itself up to liability to future purchasers. This concern is overblown. Under *Kirk*, only a builder-vendor is liable for implied warranty of workmanlike construction. 373 N.W.2d at 496. A lender merely conducting inspections or approving plans does not become a builder-vendor. *See id.* at 496 (defining builder-vendor as a person who builds a home on land he owns, then sells the home and land together to the buying public). Further, lenders can disclaim implied warranties. *Henry v. First Fed. Sav. & Loan Ass'n of Greene Cnty.*, 459 A.2d 772, 775 (Pa. Super. Ct. 1983) (holding lender that contracted to inspect "for its own protection" and stipulated it assumed "no responsibility for completion of said building" could not be sued on a breach of warranty of quality). Finally, courts have rejected liability for lenders that do not take over the actual construction:

> The bank cannot be said to have warranted the construction because it
> did not do the construction work. The status of the bank is not changed

case, it is entirely unclear that the bank is less sophisticated than Pro-Build, a labor and materials supplier. If anything, it appears the bank may be more sophisticated.

**C. The Policy of the Implied Warranty in Iowa.** We conclude the policies underlying the implied warranty of workmanlike construction in Iowa do not support its extension to a foreclosing lender. We adopted the implied warranty in *Kirk* and extended it in *Speight* for the protection of innocent home buyers to address their disparity in expertise and bargaining power with sophisticated builder-vendors. *See Speight*, 744 N.W.2d at 110 (The implied warranty "is a judicially created doctrine

---

by the fact that its officers reviewed and approved the original plans and specifications. Such actions by the bank are for the protection of its security and not for the benefit of future buyers.

*Smith v. Cont'l Bank*, 636 P.2d 98, 100 (Ariz. 1981); *see also Rice v. First Fed. Sav. & Loan Ass'n of Lake Cnty.*, 207 So. 2d 22, 23 (Fla. Dist. Ct. App. 1968) (concluding that a lender is under no duty to inspect the progress of construction for the benefit of anyone but itself).

Courts have recognized lender liability for construction defects only under limited circumstances not present in this case. South Carolina, for example, has allowed claims against a lender if it is also a developer, is aware of defects but conceals them, or "when the lender becomes highly involved with construction in a manner that is not normal commercial practice [because] it is so amalgamated with the developer or builder so as to blur its legal distinction." *Kennedy v. Columbia Lumber & Mfg. Co.*, 384 S.E.2d 730, 734 (S.C. 1989). The lender's liability is limited to defects in the work performed by the lender:

> In both *Kirkman* [*v. Parex, Inc.*, 632 S.E.2d 854 (S.C. 2006),] and *Roundtree* [*Villas Ass'n, Inc. v. 4701 Kings Corp.*, 321 S.E.2d 46 (S.C. 1984),] the lender actually assumed some degree of control of the property, made improvements thereon, and/or was partner in efforts to sell the same. In fact, in *Roundtree*, even though a duty of care was found, it was expressly limited to the repairs the lender actually performed. Likewise, in *Kirkman*, whether or not the lender had impliedly warranted the house turned on whether or not it was "substantially involved in completing the house."

*Regions Bank v. Coll. Ave. Dev., LLC*, Civil Action No. 8:09-1095-RBH, BHH, 2010 WL 985298, at *7 (D.S.C. Jan. 22, 2010) (citations omitted), report and recommendation *adopted as modified*, 2010 WL 973480 (D.S.C. Mar. 10, 2010). These cases make clear that a lender may inspect and monitor construction to protect its interest in the security for its loan without assuming liability for construction defects.

implemented to protect an innocent home buyer by holding the experienced builder accountable for the quality of construction."); *Kirk*, 373 N.W.2d at 493–94 (noting increased interest in consumer protection); *see also Rosauer*, 856 N.W.2d at 912 (discussing policies underlying implied warranty and declining to extend it to a developer purchasing a lot). We will not equate financial institutions with home buyers. *See Frickel*, 725 P.2d at 425 (describing the purchase of an apartment complex as an "arm's length transaction" and contrasting that with the unequal bargaining position of the average home buyer). As we discuss above, before extending credit a lender generally can protect itself against defects in the construction it finances through its own due diligence and by express contractual provisions with its borrowers (including assignments of claims against the builder). *Cf. Hays*, 655 S.W.2d at 161 (noting that investor-purchaser of apartment building can protect itself through inspections and express warranties). The *Hays* court aptly observed: "If the courts undertake to establish implied warranties on used buildings, especially multi-family buildings bought for investment, they will enter a morass of controversy and uncertainty through which no clear, reliable road may be charted." *Id.* We share these concerns. Financial institutions, like professional investors in real estate, do not need the protection of judicially created implied warranties. The bank simply is not the type of innocent consumer the implied warranty of workmanlike construction was judicially adopted to protect.

### IV. Disposition.

For these reasons, we hold the implied warranty of workmanlike construction does not extend to a lender acquiring apartment buildings by a deed in lieu of foreclosure. We affirm the decision of the court of

appeals and affirm the district court judgment dismissing the bank's implied warranty claim. The district court's ruling denying summary judgment on the bank's contract claim is reversed, and this case is remanded for entry of a judgment of dismissal.

**DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED.**

All justices concur except Wiggins, Hecht, and Appel, JJ., who dissent.

#13–0060, *Luana Sav. Bank v. Pro-Build Holdings*

**WIGGINS**, **Justice (dissenting).**

When deciding whether to extend the common law, we do not choose a rule merely because a majority of those jurisdictions has or has not decided to extend the common law. Instead, we look at the policy behind the rule and decide if the policy behind the rule is sound.

A few years back, we extended the implied warranty of workmanlike construction to subsequent purchasers of improved property. *Speight v. Walters Dev. Co.*, 744 N.W.2d 108, 116 (Iowa 2008). Our reason for doing so was that the rationale behind the implied warranty of workmanlike construction is to ensure a dwelling "will be fit for habitation." *Id.* at 113 (internal quotation marks omitted). In *Speight* we said, the status of the buyer or owner of the building does not vitiate the implied warranty of workmanlike construction because the fulfillment of the warranty depends on the quality of building delivered, not the buyer. *Id.*

We agreed with the rationale of the Idaho Supreme Court when extending the warranty in *Speight*. *Id.* The Idaho case from which we borrowed the rationale used the same rationale to extend the warranty to "residential dwellings purchased for income-producing purposes which have never been occupied by the buyers." *Tusch Enters. v. Coffin*, 740 P.2d 1022, 1032 (Idaho 1987).

Here, a genuine issue of material fact exists as to whether the builder breached the implied warranty of workmanlike construction. This breach affected the habitability of the building. This breach occurred no matter who owned or resided in the dwelling units. Therefore, I would find the warranty applies to the bank and let the jury

decide the fact issues as to whether the defendant was a builder, and if so, did the builder breach the warranty?

Appel, J., joins this dissent.

**HECHT, Justice (dissenting).**

The majority rejects Luana Savings Bank's request for implied warranty protection, concluding only a narrow category of those suffering economic loss resulting from poor workmanship of residential structures built by a particular category of builders are worthy of legal protection under implied warranty law. But "[d]isparity in the law should be founded upon just reason and not the result of adherence to stale principles . . . ." *Lane v. Trenholm Bldg. Co.*, 229 S.E.2d 728, 730 (S.C. 1976); *see also Kennedy v. Columbia Lumber & Mfg. Co.*, 384 S.E.2d 730, 734–35 (S.C. 1989) (suggesting it is "repugnant" to deny implied warranty relief due to "traditional and technical legal distinctions"). Because I find the majority's reasons for refusing to extend the protection of implied warranty to Luana Savings Bank unconvincing, I respectfully dissent.

A primary principle of the majority opinion is that purchasers of single-family residences are worthy of protection because of their "innocence" or lack of sophistication in buying residential real estate. Although I concede banks are often populated by persons with greater knowledge about commercial transactions than ordinary consumers, I believe this distinction is wholly inadequate as a justification for denying banks a remedy based on implied warranty for shoddily constructed buildings intended for habitation.

The business of constructing modern residential structures is a complex business that requires expert knowledge in a plethora of areas. *See Speight v. Walters Dev. Co.*, 744 N.W.2d 108, 111 (Iowa 2008) (noting constructed homes "are increasingly complex"); *Kirk v. Ridgway*, 373 N.W.2d 491, 494 (Iowa 1985) (similar). Developers, builders, and

contractors of such structures are sophisticated in the sense that they commonly have a "high degree of specialized knowledge and expertise with regard to residential construction." *Smith v. Frandsen*, 94 P.3d 919, 925 (Utah 2004). Their work is complex and regulated by many governmental regulations and industry codes. *Richards v. Powercraft Homes, Inc.*, 678 P.2d 427, 430 (Ariz. 1984). Their sophistication derived from knowledge and experience equips them to detect latent defects in construction materials and workmanship. But arms-length mortgage lenders lack such knowledge and experience and, like ordinary consumers purchasing residential property, are not equipped with the kind of sophistication that should count in deciding whether an implied warranty remedy should be available to them. Their knowledge of balance sheets, income statements, interest rates, and security instruments does not equip them with the same type of sophistication required for perceiving defects in construction materials or latent defects in the quality of workmanship.

In *Speight*, we extended the implied warranty of workmanlike construction owed by construction contractor-builders to subsequent purchasers of residential real estate. *Speight*, 744 N.W.2d at 114. Our rationale in that case for extending the warranty beyond the initial purchasers to subsequent purchasers was based on a simple proposition: The knowledge gap between the construction contractor-builders and initial residential property purchasers is coterminous with the knowledge and sophistication gap between contractor-builders and subsequent purchasers. *Id.* Accordingly, we rejected the notion of "buyer beware" for both initial and subsequent purchasers of residential real estate. *See id.* In my view, the knowledge and relevant sophistication gap noted in *Speight* is equally vast between contractors

and mortgage lenders financing the construction of buildings intended for residential purposes. Just as we rejected for compelling reasons the notion of "buyer beware" in *Speight*, we should quickly dispatch the notion of "lender beware" under the circumstances presented here.

I also find unpersuasive the majority's assertion that banks are less worthy of protection offered by the law of implied warranty than consumer-purchasers of residential property because banks possess financial resources enabling them to inspect construction projects, detect workmanship defects, and avoid losses of the type claimed by Luana Savings Bank. Conceding for the sake of discussion that banks often have greater financial resources at their disposal than consumer-purchasers of residential real estate, I find this distinction unsatisfying as a justification for denying Luana Savings Bank a remedy based on the law of implied warranty. The purpose of the implied warranty of good workmanship is to allocate, when possible, the economic losses resulting from poor construction workmanship to parties that provide poor workmanship causing damage to others. *See Speight*, 744 N.W.2d at 110 (noting the implied warranty operates by "holding the experienced builder accountable for the quality of construction"); *see also Tusch Enters. v. Coffin*, 740 P.2d 1022, 1032 (Idaho 1987) ("[I]t is the builder or builder-developer whose conduct has created the latent defect, and it is the builder or builder-developer who is in the better position to guard against and remedy such defects."). Those providing shoddy workmanship in residential construction should bear the resulting losses whether they are suffered by consumer-purchasers or commercial interests like Luana Savings Bank. The law of implied warranty should be available in either instance to allocate the cost of the shoddy workmanship to the person or entity responsible for it.

Unlike my colleagues in the majority, I believe *Tusch Enterprises* was correctly decided. In extending the implied warranty of workmanship to provide a remedy for investors who bought apartment buildings for investment purposes (rather than for their own residential use), the court recognized that the compelling reasons for protecting consumer-purchasers of residential property from losses resulting from defective workmanship also justified protection of purchasers who were motivated by a profit motive rather than a need for shelter. *See Tusch*, 740 P.2d at 1031.

My colleagues in the majority who reject Luana Savings Bank's claim prefer the reasoning advanced by the dissent in *Tusch*. The dissent there viewed "investors in real estate" as standing "a far cry" from the ordinary buyer of a new house. *Id.* at 1038–39 (Shepard, C.J., dissenting). But the difference between investors and ordinary buyers perceived by the *Tusch Enterprises* dissent is specious for the reason (knowledge and relevant sophistication gap) I have explained above. I simply cannot accept that investors who suffer loss as a consequence of shoddily constructed buildings designed for residential use should be denied the same remedy as ordinary consumers who purchase the same type of property for their own occupancy.

Extending the implied warranty of workmanlike construction to protect commercial interests like Luana Savings Bank from shoddy construction workmanship imposes no new burden on contractor-builders. We addressed this issue head-on in *Speight*:

> Walters contends that allowing the recovery the Speights seek would lead to increased costs for builders, increased claims, and increased home prices. However, builder-vendors are currently required to build a home in a good and workmanlike manner. The implied warranty of workmanlike construction reasonably puts the risk of

shoddy construction on the builder-vendor. The builder-vendor's risk is not increased by allowing subsequent purchasers to recover for the same latent defects for which an original purchaser could recover.

*Speight*, 744 N.W.2d at 114. As the Mississippi Supreme Court has observed:

> The builder already owes a duty to construct the home in a workmanlike manner . . . . If we extend potential liability of the builder to subsequent purchasers, the builder still is burdened only with the duty to construct the home in a workmanlike manner, etc. In other words, no greater effort will be imposed on the builder to protect himself.

*Keyes v. Guy Bailey Homes, Inc.*, 439 So. 2d 670, 673 (Miss. 1983). Extending the warranty to Luana Savings Bank here would not increase the contractor-builder's burden. Moreover, a blameless builder would remain able to avoid liability for defects he did not cause by showing "that the defects are not attributable to him, that they are the result of age or ordinary wear and tear, or that previous owners have made substantial changes." *Richards*, 678 P.2d at 430; *see also Moxley v. Laramie Builders, Inc.*, 600 P.2d 733, 736 (Wyo. 1979) ("The builder always has available the defense that the defects are not attributable to him.").

My colleagues in the majority suggest the extension of implied warranty I propose will create unlimited liability for builders, stretching indefinitely into the future, and create "a morass of controversy and uncertainty through which no clear, reliable road may be charted." *Hays v. Gilliam*, 655 S.W.2d 158, 161 (Tenn. Ct. App. 1983). This fear is vastly overblown. The road I propose to chart is clear and unobstructed. Construction contractors who build shoddy buildings intended for residential purposes will be accountable under the law of implied warranty. The road ahead under the principle I suggest here is also

reliable. Iowa courts stand ready and able to apply the familiar doctrine of implied warranty in matters such as this.

I also find no reason to believe that, as the majority intimates, extending the implied warranty of workmanlike construction to protect commercial interests like Luana Savings Bank will create unlimited liability for builders stretching indefinitely into the future. The duration of builders' exposure for breaches of implied warranty is already limited by the applicable statute of repose, as we noted in *Speight*:

> Walters argues that allowing subsequent purchasers to recover for a breach of the implied warranty of workmanlike construction would subject builder-vendors to unlimited liability; however, we are not persuaded. Iowa Code section 614.1(11) provides a safety net—a statute of repose for potential plaintiffs seeking to recover for breach of an implied warranty on an improvement to real property. . . .
>
> . . . In cases involving the construction of a building, such as this home, that period begins upon completion of the construction of the building. As a result, builder-vendors are not liable on an implied-warranty claim after the statute of repose has run, regardless of who owns the home.

*Speight*, 744 N.W.2d at 115 (citations omitted). Regardless of how many subsequent purchasers take ownership of the house, and regardless of who those subsequent purchasers are (with some narrow exceptions), the extent of builders' liability for unworkmanlike construction remains the same.

For these reasons, I would reverse the summary judgment and remand for trial.

Appel, J., joins this dissent.