# IN THE COURT OF APPEALS OF IOWA

No. 16-0801
Filed October 25, 2017

**DAVID and RACHAEL SOKOL,**
     Plaintiffs-Appellants,

**vs.**

**ROBERT and EILEEN MORRISSEY,**
     Defendants-Appellees.
_____

     Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell, Judge.


     Home buyers appeal from a district court order on their claims related to alleged construction defects and the failure of the sellers to offer them the first right to purchase an adjacent lot. **AFFIRMED IN PART AND REMANDED WITH INSTRUCTIONS.**


     Billy J. Mallory and Allison M. Steuterman of Brick Gentry, P.C., West Des Moines, for appellants.

     Kenneth R. Munro of Munro Law Office, P.C., Des Moines, for appellees.


     Heard by Danilson, C.J., and Tabor and McDonald, JJ.

**TABOR, Judge.**

Home buyers David and Rachael Sokol sued builder-sellers Bob and Eileen Morrissey after encountering various problems with their new home. Following a bench trial, the district court found the Morrisseys had violated the disclosure requirement of Iowa Code section 558A.2 (2009), and awarded the Sokols limited damages. The Sokols appeal, contending the district court should have awarded additional damages under chapter 558A or, alternatively, based upon a breach of the implied warranty of workerlike construction,[1] a breach of the purchase agreement, the Morrisseys' representations about the property, or Bob's negligence in supervising the home's construction. In addition, the Sokols argue the district court should have granted a declaratory judgment obligating the Morrisseys to sell an adjacent lot to the Sokols for its tax-assessed value.

We affirm the district court's ruling on all grounds but one—breach of implied warranty. Because we find the court erred in its determination Bob Morrissey was not a builder-vendor under the second requirement of the implied-warranty test, we remand for the district court to consider whether the Sokols satisfied the remaining requirements.

## I.      Facts and Prior Proceedings

In 2005, seventy-five-year-old jeweler Bob and his wife, Eileen, decided to build a home for their retirement. Bob, who had never built a home before, acted

---

[1] While Iowa case law refers to "workmanlike" construction, the Iowa Practice Series now uses the term "workerlike" construction, which we adopt in this decision as the gender-neutral equivalent. *See Kirby Offshore Marine Pac., LLC v. Emerald Servs., Inc.*, No. 2:17-CV-0224rsl, 2017 WL 2215819, at *1 n.1 (W.D. Wash. May 19, 2017) (describing the word "workmanlike" as "outdated" and finding "workerlike" to be "more appropriate").

as the general contractor for the project.[2]  Bob began the home-building process by hiring an architect to design the home and purchasing a tract of land, which he subdivided into two lots: Lot 1 and Lot 2, Morrissey Estates.  He listed himself as the owner and developer of the land.  Bob and Eileen also created an informal entity, "Our Home Builders," which Bob explained was meant to help keep home-building expenses separate from personal expenses.  Bob created business cards for "Our Home Builders" and listed the Morrisseys' home address as the "business address."  He described the cards as "kind of a fun thing" to "[p]ass out to the kids and . . . family," but he also gave the cards to businesses involved with the project.  With assistance from a number of subcontractors, Bob began construction on Lot 1.

Bob came to the construction site almost daily.[3]  In a series of notebooks, he logged various difficulties he encountered as the construction of the home progressed.  Among other things, Bob described uncertainty about the layout of the roof, problems with the electrical wiring, and issues related to the geothermal heating unit he had installed.  Questioning at trial revealed the limits of Bob's understanding of the typical duties of a general contractor.  For instance, Bob did not investigate the applicability of any statutes, ordinances, or regulations to his construction project.  Bob also confirmed he did not do anything to determine whether the components of his home were constructed or installed pursuant to manufacturer specifications.  Instead, he relied on the expertise of the subcontractors.

---

[2] Bob had completed some of his own home repairs over the years.  In addition, he worked construction for a short period in 1948, the year he graduated from high school.

[3] Eileen did not participate in the construction of the home.

By late 2007, Bob had nearly completed construction, but as the Morrisseys prepared to move, Eileen became ill. They soon decided against moving and contacted a realtor—a relative of Bob's—about selling the newly constructed home. Bob finished the home shortly thereafter, and the Morrisseys entered into an agreement with the realtor in November 2008. On the full listing of the property, the realtor identified the builder of the home as "Our Home Builders."

The Sokols offered to purchase the home on June 11, 2009, and the Morrisseys accepted. In an addendum to the purchase agreement, the Morrisseys also agreed to grant the Sokols the first right of refusal to purchase the adjacent lot, Lot 2, at "current market price" in the event the Morrisseys offered it for sale outside their immediate family. The provision required the Sokols to exercise the right "within [sixty] days' receipt of a written notice" from the Morrisseys of the sale offering.

The Morrisseys completed a sellers' disclosure form relating to the condition of the property. *See* Iowa Code § 558A.4(1)(a) (requiring disclosure of "information relating to the condition and important characteristics of the property and structures located on the property, including significant defects in the structural integrity of the structure"). They disclosed no known problems with the home, writing simply: "new construction." Bob testified that although he never lived in the home, he had continued to monitor the property regularly after completing construction and had observed no issues with the home.

The Sokols had the home inspected on June 22, 2009. The inspector observed relatively insignificant issues with the home. He documented holes and

cracks in the EIFS/synthetic stucco siding;[4] Bob agreed to repair the holes. The inspector also noted concerns with the rock retaining wall. Bob responded: "Netting ha[s] already been installed behind the retaining wall to prevent soil erosion—nothing else is needed and nothing else will be added." The Sokols moved forward with the sale after Bob agreed to make limited repairs.[5]

The Sokols took possession of the home on July 14, 2009. They began experiencing problems within three months. The Sokols first noticed issues with the geothermal unit. Rachael explained: "The weather was getting cold, so it was time to switch the system over from the . . . cooling mode to the heating mode. And after that switch occurred, the breakers started flipping and the system kept turning off, which caused the heat to go off." Next, electrical issues arose—a broken key pad on the garage door, inoperative outlets, a malfunctioning thermostat, and several can lights that persistently burned out. The Sokols were unable to locate the security system's wiring Bob claimed to have installed. And then various faucets, both inside and out of the home, started leaking.

The Sokols contacted Bob, who initially tried to remedy the issues either himself or through subcontractors who had worked on the home. Bob had also paid for a one-year homeowner's warranty to cover repairs to the home. But despite Bob's repair attempts, some of the problems persisted. The Sokols began to have the issues repaired at their own cost.

---

[4] Bob explained: "EIFS is a European finish put on the outside of the homes that was developed in Germany after World War II. They needed something that . . . would insulate the house and have a permanent finish outside."

[5] The repairs consisted of: installing window screens and sliding-door screens, having a technician inspect the air conditioning unit, repairing holes in the siding, having a plumber tighten toilet tanks throughout the home, tightening a PVC drain pipe in the basement, and repairing the switch for the master bath.

Nearly five years after the sale, on July 9, 2014, the Sokols wrote to Bob requesting he remedy several issues they continued to experience with the home, including: flooding in the basement; leaking from the roof, gutters, and windows; cracking in the siding; rocks falling from the retaining wall; improper installation of the geothermal unit and air conditioner; and faulty wiring.  The Sokols also asked for $20,000 to reimburse them for the expenses they had already incurred making repairs.  Bob responded: "I was sorry to hear of the problems you have encountered the last few years.  At this time it is difficult for me to get away for any length of time, but I will follow up on what I find out, and I will pass it on to you."

Then, on August 30, 2014, the Morrisseys listed Lot 2 for sale at a price of $90,000.  They did not give written notice to the Sokols before listing the property.

The Sokols filed suit against the Morrisseys on September 8, 2014.  The petition at law consisted of ten counts: (1) breach of contract, (2) breach of the implied warranty of merchantability, (3) breach of the implied warranty of fitness, (4) breach of the implied warranty of good workership, (5) misrepresentation or concealment, (6) negligent misrepresentation, (7) negligence, (8) violation of Iowa Code chapter 558A, (9) breach of express warranty, and (10) declaratory judgment, requesting the court to "construe and determine the validity and terms of the Addendum to the Purchase Agreement and declare that Defendants are required or obligated to provide Plaintiffs with the First Right of Refusal/Option to Purchase" Lot 2.

While the case was pending, the Morrisseys, who had taken Lot 2 off the market, again advertised the property. The Morrisseys sent a letter to the Sokols on June 29, 2015, notifying them of their right to purchase the lot for $95,000, the new listing price. On September 1, the Sokols responded, disputing that $95,000 was the fair market value for the lot and noting: "At this time the Sokols continue to assert their rights to purchase the lot at the actual fair market value under the terms of the Addendum to Purchase Agreement." The Sokols did not indicate what amount they believed to be the "actual fair market value" of Lot 2.

The case proceeded to a bench trial on March 30 and 31, 2016. The Sokols, who described continuing problems with the home, asked for reimbursement for the out-of-pocket expenses they had incurred, damages to cover completion of the repairs to the home, and attorney fees. Rachael explained the damages exceeding the $20,000 she had requested in July 2014 were issues they discovered only after the July 2014 letter.[6] In addition, she testified that at the time she and her husband purchased the home, she did not know Bob was not a professional builder. She quipped: "I mean, I wouldn't let a dentist take out my gallbladder . . . . And so why would you let somebody who has no background or knowledge do something or build something or do something that they have no expertise in?"

A general contractor hired by the Sokols testified about many deficiencies with the home. He cited problems with the EIFS siding,[7] gutters, electrical and

---

[6] The Sokols did not seek estimates on many of these repairs until after filing suit.

[7] The parties disputed whether the Sokols purchased the home with knowledge of the defects in the siding. Bob testified the cracking in the siding the Sokols complained of at trial was visible and noted by the inspector before they bought the house. Rachael

security systems, roof, deck, and retaining wall,[8] as well as the installation of various items inside the house. He also noted evidence of water damage in the basement. The contractor opined that had the home been built in a workerlike manner, these issues would not have arisen.

A heating, ventilation, and air-conditioning (HVAC) contractor testified about the condition of the geothermal unit. He explained the geothermal system had not been installed pursuant to manufacturer specifications. Specifically, the water in the system was of poor quality and too warm, causing sweating on the surface of the system and corrosion both inside and out.

Following trial, the district court awarded the Sokols damages of $20,737.80 based on a violation of the disclosure requirement of chapter 558A. The court found "good grounds to believe" Bob did not know of any defects with the home when he sold it, but because two areas—the geothermal unit and the can lighting—"showed material defects so quickly following sale that a seller in [Bob's] position . . . would have become aware of the defects had he used ordinary care to find them," the court awarded the Sokols the amount they had expended remedying those issues. The court rejected the Sokols' other claims for damages as either unproven or inapplicable and, on the declaratory-judgment claim, found the Sokols had waived their right of first refusal.

---

testified the original cracking was repaired before she and her family moved in, and only after the Sokols took possession of the house did the new cracks emerge.

[8] The contractor recommended the retaining wall be completely replaced and each individual rock be connected by rebar. On cross-examination, the contractor admitted he had never seen a retaining wall built according to his recommended specifications. He explained: "I don't do landscaping so—but under the Code and the proper installation, there's not much on installing stone walls, but the information that's available on proper installation is rebar installed into the stone."

The Sokols now appeal the district court's order.[9]

## II.    Scope and Standard of Review

The parties disagree about our scope of review. The Sokols contend our review is de novo, but the Morrisseys assert our review is for errors of law. The Sokols emphasize: "While some objections were ruled upon during trial, the Court also too[k] all exhibits into evidence subject to objections of hearsay, cumulative evidence, and weight to be given the exhibits."

Here, the bulk of the Sokols' claims are actions at law. *See, e.g.*, *Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 179 (Iowa 2010) ("Where the basic rights of the parties derive from the nonperformance of a contract, where the remedy is monetary, and where the damages are 'full and certain, remedies are usually provided by actions at law, and equity has no jurisdiction.'" (citation omitted)). Although the clerk docketed the case as an equitable action, the Sokols sought equitable relief in only one of their ten counts—the request for a declaratory judgment. We consider the parties' pleadings, the requested relief, the nature of the case, as well as whether the court ruled on evidentiary objections to determine whether a declaratory judgment action is legal or equitable. *See Passehl Estate v. Passehl*, 712 N.W.2d 408, 414 (Iowa 2006). But if a party demands both legal and equitable relief in one action, as is the case here, "the action is ordinarily classified according to what appears to be its primary purpose or its controlling issue." *Van Sloun*, 778 N.W.2d at 179. Our "review on appeal is not governed by how the clerk docketed the case, but rather

---

[9] The Sokols asked the supreme court to retain this case to address "the interplay between warranties required by vendor builders and disclosures required by home owner/sellers." But the supreme court transferred the case to us.

by how the parties tried the case in the district court." *Longfellow v. Sayler*, 737 N.W.2d 148, 152 (Iowa 2007).

Regardless of the extent of the district court's rulings on evidentiary objections,[10] because the Sokols' case centered on claims at law for known monetary damages, we find this case was tried at law, which makes our review for errors at law. *See* Iowa R. App. P. 6.907. As long as the district court's findings of fact are supported by substantial evidence, we are bound by them, but we are not bound by the district court's legal conclusions. *See Longfellow*, 737 N.W.2d at 153. "Evidence is substantial when a reasonable mind would accept it as adequate to reach the same findings. Evidence is not insubstantial merely because it would have supported contrary inferences." *Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 490 (Iowa 2000) (citation omitted).

### III.    Analysis

### A. Disclosure Requirements

Chapter 558A, Iowa's Real Estate Disclosure Act, requires individuals seeking to transfer real estate to deliver to interested transferees a written disclosure statement detailing "the condition and important characteristics of the property and structures located on the property, including significant defects in the structural integrity of the structure, as provided in rules which shall be adopted by the real estate commission." Iowa Code § 558A.4; *see also id.* § 558A.2; Iowa Admin. Code r. 193E-14.1(6) (providing sample disclosure statement). The standard for reporting the required information is one of good faith, requiring a "reasonable effort . . . to ascertain the [relevant] information" and

---

[10] The district court did rule on objections throughout the trial.

any approximation "be based on the best information available at the time." Iowa Code § 558A.3(1). A person who violates the disclosure requirement through "error, inaccuracy, or omission" of required information is liable to the transferee if "that person has actual knowledge of the inaccuracy, or fails to exercise ordinary care in obtaining the information." *Id.* § 558A.6(1); *see also Jensen v. Sattler*, 696 N.W.2d 582, 587 (Iowa 2005) (finding showing of failure to exercise ordinary care, whether or not the seller lived on the property, to be sufficient).

The Sokols assign error to the district court's interpretation of chapter 558A as well as to the district court's factual findings. They contend the court incorrectly found the Morrisseys, as sellers of a newly constructed home, were not required under chapter 558A to disclose issues that arose during construction. The Sokols also argue the evidence presented at trial demonstrated the Morrisseys had actual knowledge of the defects with the home and failed to exercise ordinary care in obtaining information about the defects by neglecting to ensure the subcontractors' work was completed pursuant to industry standard.

The Morrisseys respond that chapter 558A does not require disclosure of every problem that arose while the home was being built. Citing the report of the initial home inspector, the Morrisseys contend there is no evidence they "knew, or should have known, of any defects with the house (other than for the geo-thermal unit and the can lights)" at the time of sale.

Regardless of the exact scope of the disclosure requirement, the Sokols have failed to identify with any specificity where the record reveals Bob's actual knowledge of any defects in the home before he completed it. Rather, the

Sokols cite generally to 300 pages of notes Bob jotted down during construction—as well as after he had completed the home—and claim: "Defendant knew of issues with water intrusion, the geothermal HVAC, electrical, plumbing, the EIFS, etc." The Sokols do not describe any details related to those issues, nor do they pinpoint when the issues occurred.

Moreover, the Sokols provide no authority supporting their interpretation of the disclosure requirement. *See* Iowa R. App. P. 6.903(2)(g)(3) (requiring the argument section to "contain[] the appellant's contentions and the reasons for them with citations to the authorities relied on and references to the pertinent parts of the record" and noting "[f]ailure to cite authority in support of an issue may be deemed waiver of that issue"). Reaching the merits of this issue would require us "to assume a partisan role and undertake a party's research and advocacy." *Hanson v. Harveys Casino Hotel*, 652 N.W.2d 841, 843 (Iowa Ct. App. 2002). We decline to adopt such a role and, accordingly, limit our analysis to the Sokols' challenge to the district court's fact-findings.[11]

We find substantial evidence in the record to support the district court's conclusion the Morrisseys did not have actual knowledge of any defects with the home and failed to exercise ordinary care only in regards to the geothermal unit and can lighting. Bob testified at trial he did not know of any defects with the

---

[11] We are also unconvinced by the Sokols' contention the requirement of "exercis[ing] ordinary care in obtaining the information" in the written disclosure includes the construction process. *See* Iowa Code § 558A.6(1). The Sokols argue Bob had to ensure the home was constructed in accordance with applicable ordinances and the components installed pursuant to manufacturer specifications. But exercise of ordinary care refers to obtaining information *required by the disclosure*—e.g., discovering a defect in the home or determining whether the property is located in a flood plain—not to exercising ordinary care in performing construction. *See Jensen*, 696 N.W.2d at 587 (stating seller must "'exercise ordinary care in obtaining the information' to be put on the disclosure form").

home when he sold it. The district court credited Bob's testimony, and we defer to that determination. *See Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 394 (Iowa 2010) ("The district court as the fact finder, determines witness credibility and the weight of the evidence as a whole, and we will not disturb the district court's findings if they are supported by substantial evidence." (citation omitted)).[12]

We also find substantial evidence in the record to support the district court's finding the additional house problems alleged by the Sokols "were not so apparent and would not have been revealed through the exercise of ordinary care." Bob testified that in the approximately two years between his completion of the home and its sale, he visited the home regularly and did not detect any problems. As the court noted: "[T]he Sokols paid for an inspector to look at the home, including the [EIFS] and the roof. The inspection revealed limited or no concerns." Morrissey believed the home was free from defects, and he had no reason to believe that problems would develop years later.

---

[12] In their reply brief, the Sokols focus for the first time on specific entries in Bob's notebooks from the time leading up to and after the Sokols offered to purchase the home. But the entries are either ambiguous (e.g., "8-8, 9-08 Worked in house, air conditioner"), involve remedies requested by the Sokols (e.g., "7-1-09 . . . Also made a trip to purchase some Styrofoam in a can (Great Stuff) to fill woodpecker holes in several places on the siding"), or are unrelated to the issues the Sokols now allege (e.g., "9-23-08 Tree maintance [sic] @ the lot, Erosion work in ditch").

The most significant remark cited by the Sokols was: "4-15-09 Went to lot. Realtor said there was a stain spot on the ceiling in the kitchen. I can't say what it is. Stopped at Hdwe store for some white ceiling paint on the way home." At trial, Bob explained he didn't know the origin of the stain but believed it arose during construction. But although the Sokols described leaking of the air conditioner in the attic as well as leaks in other places throughout the home, the Sokols did not complain of any damage or leaking in the kitchen ceiling. Accordingly, assuming Bob was required disclose the ceiling stain, the Sokols cannot recover for this failure because they did not suffer any resulting damages. *See* Iowa Code § 558A.6 (providing liability for 558A violations is "for the amount of actual damages suffered by the transferee").

Accordingly, we affirm the district court's ruling on this issue.

**B. Breach of Implied Warranty of Good and Workerlike Construction**

We turn next to the Sokols' implied-warranty argument.[13]   The implied warranty that a home has been constructed in a reasonably good and workerlike manner protects purchasers of newly constructed homes, as well as subsequent purchasers, from latent defects—undiscoverable in the course of an ordinary inspection.  *See Kirk v. Ridgway*, 373 N.W.2d 491, 496 (Iowa 1985) (recognizing implied warranty of good workership in the sale of a home by a builder-vendor); *Speight v. Walters Dev. Co.*, 744 N.W.2d 108, 111, 114 (Iowa 2008) (extending implied warranty to subsequent purchasers); *see also Luana Sav. Bank v. Pro-Build Holdings, Inc.*, 856 N.W.2d 892, 893 (Iowa 2014) (recalling court created doctrine "to redress the disparity in bargaining power and expertise between homeowners and professional builders, and to provide a remedy for consumers living in defectively constructed homes"); *Rosauer Corp. v. Sapp Dev., L.L.C.*, 856 N.W.2d 906, 912 (Iowa 2014) (identifying need to protect "innocent homeowners who lack[] sophistication and bargaining power to protect themselves" as "overriding policy" behind implied warranty).

---

[13] The Sokols argue the Morrisseys "breached the implied warranties of merchantability, fitness for a particular purpose, and good and workmanlike manner" but their analysis focuses on the implied warranty of good and workerlike construction.  Moreover, the district court considered only the implied warranty of good and workerlike construction. We limit our analysis accordingly.  *See EnviroGas, L.P. v. Cedar Rapids/Linn Cty. Solid Waste Auth.*, 641 N.W.2d 776, 785 (Iowa 2002) (noting random mention of an issue is not sufficient to raise it for our review).

To prove a breach of implied warranty, the Sokols were required to establish:

> (1) the house was constructed to be occupied as a home; (2) the house was purchased from a builder-vendor, who constructed it for the purpose of sale; (3) the house was not constructed in a good and workmanlike manner; (4) the buyer was unaware of the defect; and (5) the buyer suffered damages.

*Flom v. Stahly*, 569 N.W.2d 135, 142 (Iowa 1997). The district court found the Sokols could not recover for a breach of implied warranty because Bob Morrissey did not fit the definition of a builder-vendor. In *Kirk*, our supreme court adopted the following definition of "builder-vendor":

> [A] person who is in the business of building or assembling homes designed for dwelling purposes upon land owned by him, and who then sells the houses, either after they are completed or during the course of their construction, together with the tracts of land upon which they are situated, to members of the buying public.
>     The term "builder" denotes a general building contractor who controls and directs the construction of a building, has ultimate responsibility for a completion of the whole contract and for putting the structure into permanent form thus, necessarily excluding merchants, material men, artisans, laborers, subcontractors, and employees of a general contractor.

373 N.W.2d 491, 496 (Iowa 1985) (citation omitted).

The parties do not dispute that Bob fits the "builder" portion of the definition; instead, they focus their arguments on the latter half of the term. The Sokols assert Bob should be considered a builder-vendor because a person is a builder-vendor "when [he] decide[s] to sell the first home." But the Morrisseys cite *Flom*, 569 N.W.2d at 142–43, in support of their position that because they originally intended to live in the house themselves and did not build the house for the purpose of selling it, Bob was not a builder-vendor.

In *Flom*, Thomas Stahly, a physician with no previous training in construction, began building a home with the help of a several hired laborers. 569 N.W.2d at 137. He and his wife moved out of the area before completing the project. *Id.* The Floms "saw a newspaper advertisement regarding the house and became interested in the property." *Id.* at 137–38. The Stahlys provided written materials about the construction of the home, which indicated "the house was approximately 85% finished." *Id.* at 138. Before purchasing the home, the Floms walked through it with the Stahlys, and Dr. Stahly described various problems he had encountered throughout the construction process. *Id.* The Floms also hired several construction professionals to inspect the property. *Id.* The Floms purchased the property and began to complete the home, but they encountered a number of unanticipated defects. *Id.* The Floms eventually sued the Stahlys alleging, among other things, breach of implied warranty. *Id.*

The supreme court found the theory of implied warranty inapplicable, reasoning "the Stahlys were not builder-vendors—persons in the business of building or assembling homes for the purpose of sale. In addition, the Stahlys intended to live in the house themselves and did not construct it for the purpose of sale." *Id.* at 142. When later discussing the definition of builder-vendor from *Kirk* and *Flom*, the supreme court explained "the Stahlys did not have the same unequal relationship with the Floms that a professional builder-vendor would have with a purchaser." *Luana Sav. Bank*, 856 N.W.2d at 897.[14]

---

[14] In *Luana Savings Bank*, the supreme court concluded defendant Pro-Build Holdings could not be sued on the implied-warranty theory because it did not own the land where the apartment complex was constructed, did not build the complex to sell to the public, and was not a general contractor. 856 N.W.2d at 897, 901.

Significant facts distinguish the instant case from *Flom*. First, the Morrisseys finished construction of the home with the intent to sell it. *See Kirk*, 373 N.W.2d at 496 (requiring home to be "purchased from a builder-vendor, who had constructed it for the purpose of sale"). In addition, the Morrisseys marketed the completed home to the general public. *See id.* at 498 (noting a "builder-vendor" is a person "who is in the business of building or assembling homes . . . who then sells the houses . . . *to members of the buying public*" (emphasis added) (citation omitted)).

But most importantly, the Morrisseys presented themselves as builder-vendors. The Morrisseys did not disclose Bob's lack of expertise in home-building. Instead, they promoted the home in a commercial realtor's listing as being constructed by what sounded like a professional entity. The advertisement stated: "This unique home was built by Our Home Builders showing overwhelming detail, pride in workmanship and quality throughout." And after Sokols offered to purchase the home, Bob maintained his professional façade. For instance, the Morrisseys declined to complete one of the Sokols' requested remedies—additional caulking around the windows and doors—and explained: "The tight seal does not allow additional caulking. Builder will further educate the buyers at the time of the final walk through." Rachael testified these circumstances led her to believe Bob was a professional builder: "To me, that led me to believe that I was buying a new house from a builder who was building

---

The court also declined to equate the plaintiff-bank, a professional investor in real estate, with "innocent home buyers." *Id.*

homes and knew what they were doing, that we were going to get a product that was brand-new and functional and not have any issues that we're having today."

Under these circumstances, we conclude Bob Morrissey fits the definition of "builder-vendor." The Morrisseys built the home—with Bob acting as general contractor—and completed it for the purpose of a commercial sale. They advertised the home as professionally built and sold it, along with the land upon which it was situated, to members of the buying public.[15] Unlike Dr. Stahly, who was fully transparent with the Floms about his amateur construction efforts, Bob held himself out as a professional builder. *See Flom*, 569 N.W.2d at 138. That persona of expertise exacerbated the unequal relationship between the Morrisseys and the Sokols. Bob possessed greater information not only about the work on the house but also about his own skill level. Because the Sokols lacked key information regarding Bob's lack of experience *and* about the intricacies of the construction, they were not able to protect their interests before deciding to purchase the home. *See Kirk*, 373 N.W.2d at 494 (identifying "increasing complexity in houses" and reliance by buyer on "skill and judgment of the builder" as underlying rationale for adopting implied warranty).[16]

---

[15] At oral argument, counsel for the Morrisseys asserted the definition of "builder-vendor" required the vendor to sell multiple *houses* rather than one house. We disagree. Were we to adopt such an interpretation, unsuspecting buyers of any builder's first home would be excluded from the implied-warranty protections.

[16] Courts from other jurisdictions have adopted a similar interpretation, underscoring the significance of a commercial sale to the general public. *See, e.g., Dillig v. Fisher*, 688 P.2d 693, 695–96 (Ariz. Ct. App. 1984) (finding implied warranty of habitability applied "where a completed structure which has never been occupied is placed on the market for sale," regardless of whether the builder was a "mass builder" or "occasional builder"); *Sloat v. Matheny*, 625 P.2d 1031, 1033 (Col. 1981) (en banc) (finding implied warranties "arise so long as there is a *commercial sale* of a new home by a builder-vendor" (emphasis added)); *Schepps v. Howe*, 665 P.2d 504, 510 (Wyo. 1983) (noting protection

Because Bob Morrissey qualifies as a builder-vendor, a remand is necessary to allow the district court to consider whether the Sokols satisfied the remaining elements of the breach-of-implied-warranty test.

## C. Breach of Contract

The Sokols next argue because the district court found the Morrisseys had not complied with the disclosure requirements of chapter 558A, it should have found a breach of the purchase agreement between the parties and awarded the Sokols attorney fees in accordance with the agreement. They contend the statutory requirements were incorporated by reference into the purchase agreement. *See Longfellow*, 737 N.W.2d at 154 ("Statutes and administrative rules can become part of a contract under the doctrine of incorporation."). The Morrisseys counter that the Sokols are not entitled to relief under the purchase agreement because the contract terms are more limited than the language of chapter 558A.

We agree with the district court that the language of the purchase agreement is insufficient to incorporate the disclosure requirement of chapter 558A. The relevant provision of the purchase agreement states: "Sellers and Buyers acknowledge that Sellers of real property have a legal duty to disclose Material Defects of which Sellers have actual knowledge and which a reasonable inspection by Buyers would not reveal." For the requirements of chapter 558A to be considered incorporated into the purchase agreement, the agreement must "make a clear and specific reference" to chapter 558A. *See id.*

---

of implied warranty of habitability extends to both "builder-developers, but also against those who hold themselves out as builders").

This agreement does not do so. In fact, as the Morrisseys point out, the contractual language is narrower than chapter 558A, requiring proof of actual knowledge of material defects.[17]  *See* Iowa Code § 558A.6(1) (requiring proof of actual knowledge *or* "fail[ure] to exercise ordinary care in obtaining the [requisite] information"). As discussed above, the Sokols failed to demonstrate this more stringent requirement. Accordingly, the Sokols cannot recover on their breach-of-contract claim.[18]

## D. Fraudulent Misrepresentation

Likewise, the Sokols' fraudulent-misrepresentation claim must fail.[19]  To prove their claim, the Sokols were required to demonstrate the Morrisseys made a false representation to the Sokols that was material, the Morrisseys knew the representation was false and intended to deceive the Sokols, the Sokols acted in justifiable reliance on the truth of the Morrisseys' representation, and the representation was a proximate cause of the Sokols' damages. *See Dier v. Peters*, 815 N.W.2d 1, 7 (Iowa 2012). Knowledge of falsity can be proven "by

---

[17] Confronted with an identical contract provision, a different panel of this court considered a party's breach-of-contract and chapter-558A claims together. *See Lanczos v. Walker*, No. 11-2101, 2012 WL 5355959, at *2 (Iowa Ct. App. Oct. 31, 2012). But in that case, the parties agreed the contract incorporated chapter 558A by reference. *Id.* Moreover, unpublished decisions are not binding precedent. Iowa R. App. P. 6.904(2)(c).

[18] At oral argument, counsel for the Sokols asserted they additionally appealed the denial of their breach-of-express-warranty claim as part of the breach-of-contract claim. We find no mention of express warranty in the Sokols' appellate brief and, therefore, decline to address the issue.

[19] The Sokols frame this issue as follows: "The District Court Erred and was Incorrect in Finding Defendants Did Not Make Fraudulent and/or Negligent Misrepresentations/Concealments." The body of their argument focuses on fraudulent misrepresentations and concealments, while mention of negligent misrepresentation is limited to a statement of law in the first sentence, and the Sokols make no specific argument in support of a negligent-misrepresentation claim. Accordingly, we decline to address it. *See EnviroGas*, 641 N.W.2d at 785.

showing that the defendant had actual knowledge of the falsity, possessed reckless disregard for the truth [or] falsely stated or implied that the representations were based on personal knowledge or investigation." *Hyler v. Garner*, 548 N.W.2d 864, 871 (Iowa 1996).

The Sokols contend the Morriseys knew of various defects with the home and "purposely concealed the defects and misrepresented the condition of the property and appropriateness/effectiveness of the repairs." But because the Sokols did not prove the Morrisseys had actual knowledge of material defects with the home and the Sokols do not allege any other basis to satisfy the knowledge requirement, they cannot recover on this claim.

### E. Negligence

The district court dismissed the Sokols' negligence claim, finding the matter was contractual and not cognizable in tort. The Sokols disagree, contending Bob, who was acting as a general contractor, had the duty to oversee the work of his subcontractors and was liable for the damages caused by their errors. We are not persuaded by the Sokols' argument. As the district court recognized, the Sokols' negligence claim is barred by the economic-loss rule, which prohibits "recovery in negligence when the plaintiff has suffered only economic loss." *Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 503 (Iowa 2011). In *Determan v. Johnson*, 613 N.W.2d 259, 260–61, 264 (Iowa 2000), our supreme court rejected a negligence claim brought by an individual who had discovered problems with a defective roof after purchasing a home built by amateur builders. The court found the buyer's claim was "based on her unfulfilled expectations with respect to the quality of the home she purchased.

Accordingly, her remedy lies in contract law, not tort law." *Determan*, 613 N.W.2d at 263; *see also id.* at 264 ("When a buyer loses the benefit of his bargain because the goods are defective . . . he has his contract to look to for remedies. Tort law need not, and should not, enter the picture." (citation omitted)). The same reasoning applies here.[20]

## F. Right of First Refusal

Lastly, the Sokols contest the district court's denial of their claim for declaratory judgment regarding their right of first refusal to purchase Lot 2. The relevant provision of the parties' purchase agreement provides:

> Sellers agree that, should the lot locally known as [****] NW Beaver Avenue and legally described as Lot 2 Morrissey Estates be offered for sale outside the immediate family of Robert and Eileen Morrissey that Buyers shall have first right of refusal to purchase said lot at current market price. Exercise of the first right of refusal shall take place within [sixty] days' receipt of a written notice from the Sellers to the Buyers that the lot is to be offered for sale "outside" the Immediate Morrissey family.

The district court found the Sokols waived their right of first refusal by failing to exercise their right within the sixty-day period. The court reasoned: "[The Sokols] could have exercised their right subject to determining the fair market value of

---

[20] *Determan* also clarifies why the negligence claims in the cases relied upon by the Sokols, *Giarratano v. Weitz Co.*, 147 N.W.2d 824 (Iowa 1967), *abrogated on other grounds by Van Fossen v. MidAmerican Energy Co.*, 777 N.W.2d 689 (Iowa 2009), and *Security National Bank v. American Piping Group, Inc.*, No. 12-1466, 2013 WL 2145763 (Iowa Ct. App. May 15, 2013), were viable. *See Determan*, 613 N.W.2d at 263 (finding no cognizable claim when "the injury at present, and the one for which recovery is sought, is limited to repair of the defective construction" and "[t]he plaintiff is not seeking to recover damages from any 'sudden or dangerous occurrence'" (citation omitted)). Unlike *Determan* or the case at hand, the claims in *Giarratano* and *Security National Bank* arose out of a "sudden or dangerous occurrence." *See Giarratano*, 147 N.W.2d at 826 (involving damages for wrongful death after a young roofer fell from a roof under construction); *Sec. Nat'l Bank*, 2013 WL 2145763, at *1 (involving damages where a worker was injured after a fall at a construction site).

the lot.  Either or both parties could have obtained appraisals at that time if there was a dispute."

The Sokols do not address the district court's determination they waived their right of first refusal, instead arguing they were entitled to a judgment "declaring Defendants have the legal obligation to sell Lot 2 to Plaintiffs for $39,500," the tax-assessed value of the property.

Before reaching the issue of valuation, we must consider the district court's finding the Sokols had waived their right of first refusal.  Without argument or supporting authority from the Sokols on this issue, we find no reason to deviate from the district court's decision.  The district court correctly decided the Sokols waived their right because they took no meaningful steps to move forward with the purchase of Lot 2.  *See Mercy Hosp. v. McNulty*, No. 14-0241, 2015 WL 576016, at *1, *5 (Iowa Ct. App. Feb. 11, 2015) (finding right-of-first-refusal provision unenforceable when party expressed intent to exercise right of first refusal but, by the time the right expired, had not taken any "affirmative steps to complete the purchase"); *cf. In re Estate of Claussen*, 482 N.W.2d 381, 384 (Iowa 1992) ("Where an option contract does not provide for any particular mode of exercise, no particular form of notice of exercise is required, and *anything amounting to an unqualified manifestation of the optionee's determination to accept is sufficient*." (emphasis added)).  In response to the Morrisseys' letter offering the Sokols the right to purchase Lot 2, the Sokols stated they "continue to assert their rights to purchase the lot at the actual fair market value" but not that they intended to purchase the lot at that value.  Although litigation was pending, the Sokols did not ask for specific performance but only a declaration

the Morrisseys were "required or obligated to provide [the Sokols] with the First Right of Refusal/Option to Purchase," which the Morrisseys had already done.

## IV. Summary

We affirm the district court's ruling in part. But because Bob Morrissey qualifies as a builder-vendor under the second requirement of the breach-of-implied-warranty test, a remand is necessary to allow the district court to consider, on the existing record, whether the Sokols demonstrated the remaining breach-of-implied-warranty requirements.

**AFFIRMED IN PART AND REMANDED WITH INSTRUCTIONS.**

Danilson, C.J., concurs; McDonald, J., dissents.

**MCDONALD, Judge.** (dissents)

I respectfully dissent from the majority's resolution of the claim for the breach of the implied warranty of workmanlike construction for two reasons. First, I disagree with the majority's application of the deferential standard of review applicable here. Second, the history of the doctrine and its legal foundations lead me to conclude the implied warranty should not be imposed under the circumstances presented.

As the majority notes, this case arises at law, and our review is for the correction of legal error. *See* Iowa R. App. 6.904(3)(a). When the matter is tried to the district court, as this case was, the district court's findings of fact "shall have the effect of a special verdict." Iowa R. App. P. 6.907. The district court's findings of fact are binding if supported by substantial evidence. *See Land O'Lakes, Inc. v. Hanig*, 610 N.W.2d 518, 522 (Iowa 2000); *Van Oort Constr. Co. v. Nuckoll's Concrete Serv., Inc.*, 599 N.W.2d 684, 689 (Iowa 1999). Evidence is substantial "when a reasonable mind would accept it as adequate to reach a conclusion." *Falczynski v. Amoco Oil Co.*, 533 N.W.2d 226, 230 (Iowa 1995). "In determining whether substantial evidence exists, we view the evidence in the light most favorable to the district court's judgment." *Chrysler Fin. Co. v. Bergstrom*, 703 N.W.2d 415, 418 (Iowa 2005). "[W]e construe the evidence broadly to uphold, rather than defeat, the trial court's judgment." *Grall v. Meyer*, 173 N.W.2d 61, 63 (Iowa 1969).

While the majority recites the correct standard of review, it does not apply the standard in reviewing the judgment of the district court. Whether someone is a builder-vendor is a question of fact. *See Kirk v. Ridgeway*, 373 N.W.2d 491,

497 (Iowa 1985) (conducting substantial evidence review on the elements of a claim of implied warranty of workmanlike construction); *see also Brown v. Merit Corp.*, 494 So. 2d 399, 400 (Ala. 1986) (holding question of whether defendant was a builder/vendor was for the jury); *Hoke v. Beck*, 587 N.E.2d 4, 7 (Ill. App. Ct. 1992) ("Whether a defendant is a builder-vendor for the purposes of the warranty is a question of fact to be determined on a case-to-case basis."); *Farm Bureau Mut. Ins. Co. v. Sandbulte*, 302 N.W.2d 104, 110 (Iowa 1981) (stating "[w]hether or not such a warranty arises is usually a question of fact to be determined from the circumstances of the parties' negotiations").

Here, the district court considered all of the evidence and found the Morrisseys were not builder-vendors, but the majority does not afford the district court's finding of fact the deference owed. The majority parses the record and makes a different finding, rather than reviewing the record to determine whether the district court's finding is supported by substantial evidence. This is a misapplication of the standard of review. Evidence is not insubstantial "merely because [the court] may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." *Raper v. State*, 688 N.W.2d 29, 36 (Iowa 2004); *see Portzen Constr., Inc. v. Cal-Co Insulation*, Inc., No. 13-0758, 2014 WL 2347821, at *4 (Iowa Ct. App. May 29, 2014) ("Our role as the reviewing court is not, however, to dissect the record anew to reach our own factual findings."). When the record is reviewed in the light most favorable to the judgment of the district court, the findings are supported by substantial evidence.

Even assuming the question presented were a question of law, I would conclude the warranty is inapplicable here. In the performance of construction contracts, Iowa has long imposed a duty of workmanlike performance upon persons in the business of building homes. *See Kirk*, 373 N.W.2d at 493 (stating it has long been the law of this state that there is an implied duty of workmanlike performance of "construction contracts"); *Smith v. Bristol*, 33 Iowa 24, 25 (1871) ("The contract was on the part of plaintiffs to do the work, nothing being specified as to the manner in which it should be done. The court held, that as a matter of law, it was to be done in a workmanlike manner."); *Mitchell v. Wiscotta Land Co.*, 3 Iowa 209, 211 (1856) (recognizing claim to recover the contract price of construction work on house "done in an unworkmanlike manner").

The Iowa rule imposing a duty of workmanlike performance in construction contracts arises out of the common law duty of workmanlike performance imposed on tradespersons and businesspersons generally. *See* Blackstone, Commentaries, Book 3, Chapter 9 ("There is also in law always an implied contract with . . . other workman that he performs his business in a workmanlike manner: in which if they fail, an action on the case lies to recover damages for such breach of their general undertaking."). However, at the common law, the duty of workmanlike performance and concomitant liability was not imposed on persons not in the profession or business at issue. *See id.* ("But if I employ a person to transact any of these concerns, whose common profession and business it is not, the law implies no such general undertaking; but in order to charge him with damages, a special agreement is required. The action is thus for something other than the breach of the implied duty.").

In *Kirk*, the supreme court extended the duty of workmanlike performance imposed on persons in the business of building homes by holding "in the sale of a home, there is an implied warranty that it has been constructed in a reasonably good and workmanlike manner." 373 N.W.2d at 496. The primary rationale for the court's creation of the implied warranty was changed circumstances. Specifically,

> [y]ears ago, before the times of tract developments, prefabricated homes, and "spec" houses, the purchase of a new home in a completed stage was fairly rare. A prospective homeowner would usually purchase a lot, hire a draftsman to prepare the plans, and employ a builder to build the house. If the house turned out to be defectively designed, the owner looked to the person who designed it. If the house was improperly built, the owner looked to the builder.

> That scenario has, to a large extent, now changed.

*Id.* at 493 (citation omitted). In other words, the nature of the homebuilding/home purchasing transaction changed. The typical modern prospective homeowner does not contract with a builder for services to construct a home. The typical modern homeowner contracts with a seller to purchase a completed home. In *Kirk*, the supreme court merely recognized this change and concluded the duty of workmanlike performance in construction contracts logically extended to a judicially implied warranty of workmanlike construction in the product itself.

The *Kirk* court set forth the following elements of a claim for breach of the implied warranty:

> (1) [t]hat the house was constructed to be occupied by the warrantee as a home;
> (2) that the house was purchased from a builder-vendor, who had constructed it for the purpose of sale;

(3) that when sold, the house was not reasonably fit for its intended purpose or had not been constructed in a good and workmanlike manner;
(4) that, at the time of purchase, the buyer was unaware of the defect and had no reasonable means of discovering it; and
(5) that by reason of the defective condition the buyer suffered damages.

*Id.* at 496.

With respect to the second element, the court maintained the common law rule and adopted the following definition of a builder-vendor:

[A] person who is in the business of building or assembling homes designed for dwelling purposes upon land owned by him, and who then sells the houses, either after they are completed or during the course of their construction, together with the tracts of land upon which they are situated, to members of the buying public.
The term "builder" denotes a general building contractor who controls and directs the construction of a building, has ultimate responsibility for a completion of the whole contract and for putting the structure into permanent form thus, necessarily excluding merchants, material men, artisans, laborers, subcontractors, and employees of a general contractor.

*Id.* (alteration in original).

The definition of a builder-vendor has several elements. The implied warranty is imposed only on a "builder-vendor" who constructed the house at issue "for the purpose of sale." *Id.* This requires proof the person "is in the business of building or assembling homes" and the home at issue was constructed with the intent it be sold to the general public. *See Luana Sav. Bank v. Pro-Build Holdings, Inc.*, 856 N.W.2d 892, 896–97 (Iowa 2014). In recent years, the supreme court has made clear the builder-vendor element is meant to "limit[] the class of potential defendants" to those in the business of building and selling homes. *See Rosauer Corp. v. Sapp Dev. L.L.C.*, 856 N.W.2d 906, 911 (Iowa 2014); *see generally Luana Sav. Bank.*, 856 N.W.2d at 893, 896 (noting

implied warranty "protect[s] an innocent home buyer [from] the *experienced builder*" and "redress[es] disparity in bargaining power and expertise between homeowners and *professional builders*" or "*sophisticated builder-vendor[s]*" (emphases added)). The warranty is meant only to hold the "*experienced* builder accountable for the quality of construction." *See Speight v. Walters Dev. Co.,* 744 N.W.2d 108, 110 (Iowa 2008) (emphasis added).

In this case, the district court accurately stated the controlling law and found the Morrisseys were not builder-vendors within the meaning of *Kirk* and subsequent cases. The district court found "[t]here is no question that [the Morrisseys] sincerely started this project with the intent to make it their retirement home." The district court found there was "no question that they only changed their minds after Eileen's health declined." The district court also found the Morrisseys were "not in the business of building homes for sale to the public."

I agree with the district court's finding that the Morrisseys were not builder-vendors within meaning of *Kirk* and subsequent decisions. The controlling case is *Flom v. Stahly*, 569 N.W.2d 135 (Iowa 1997).

> In *Flom*, a defendant physician and his wife began construction of a home on land they owned, intending to live in it. Before completing construction, the Stahlys moved out of state and sold the uncompleted home to the Floms. When wood in the home began to rot, the Floms sued for breach of the implied warranty of workmanlike construction, among other claims. We rejected this extension of *Kirk* because the Stahlys did not meet the second element of the *Kirk* test—they were not builder-vendors building a home for the purpose of sale to the public.

*Luana Sav. Bank,* 856 N.W.2d at 897. As in *Flom*, the defendants here intended to live in the house when starting construction. *See Flom*, 569 N.W.2d at 137. As in *Flom*, the defendants here were not "in the business" of building and selling

houses. As in *Flom*, there was not in fact an unequal relationship between the parties due to experience in the industry.

The majority attempts to distinguish *Flom* by noting the house in *Flom* was under construction when sold but here the house was completed when sold. The status of construction at the time the seller formed the intent to sell the home and then actually sold the home is immaterial. In *Kirk*, the supreme court explained the builder-vendor classification applies to those "in the business of building or assembling homes" and "who then sells the houses, either after they are completed or during the course of their construction." 373 N.W.2d at 496. The imposition of the warranty does not turn on the status of construction at the time of sale.

The majority also attempts to distinguish *Flom* by noting the defendants in this case represented themselves to be builders—Our Home Builders. The representation is immaterial to the issue. The judicially implied warranty was an extension of liability imposed on persons in the business of building homes. It is not based on representations between the seller and buyer or principles of contract. *See Speight*, 744 N.W.2d at 113–14 (stating the implied warranty "exists independently of the contract [between the parties] by its very nature" and noting "the implied warranty of workmanlike construction is a judicial creation and does not, in itself, arise from the language of any contract between the builder-vendor and the original purchaser"). The implied warranty is applicable only where there is in fact an unequal position between the parties due to the sellers experience in the industry. *See Luana Sav. Bank*, 856 N.W.2d at 897 ("Because they intended to live in the house themselves and had never built a home before,

the Stahlys did not have the same unequal relationship with the Floms that a professional builder-vendor would have with a purchaser."); *Rosauer Corp.*, 856 N.W.2d at 910 ("We rejected this extension of *Kirk* because the Stahlys did not meet the second element of the *Kirk* test—they were not builder-vendors building a home for the purpose of sale. Because the Stahlys had intended to live in the house themselves and had never built a home for resale before, the Stahlys did not have the same unequal relationship with the Floms that a builder-vendor would have with a homebuyer."). This is not to say the Morriseys' representation was legally immaterial. The representation could be material to other legal claims. Indeed, the Sokols asserted nine other claims against the Morriseys, including claims of fraud and misrepresentation arising out of this representation. The Sokols were unsuccessful in proving their other claims, but their inability to establish other claims does not mean we should extend liability on this claim where not consistent with the underlying doctrine.

Limiting the application of an implied warranty to a particular class of defendants is not uncommon. Iowa Code section 554.2314 imposes a warranty of merchantability with respect to goods but only "if the seller is a merchant with respect to goods of that kind." In a claim for breach of the implied warranty, the plaintiff must establish a "merchant" sold the goods. *See Kendall v. Bausch & Lomb, Inc.*, No. 05-5066-KES, 2009 WL 1740002, at *11 (D.S.D. June 17, 2009) ("While some provisions of the UCC apply to 'almost every person in business,' other provisions such as the implied warranty of merchantability are limited in application to those who are 'merchant[s] with respect to goods of that kind,' restricting the implied warranty to a much smaller group." (citation omitted));

*Wright v. Brooke Group, Ltd.*, 114 F. Supp. 2d 797, 828 (N.D. Iowa 2000); *Renze Hybrids, Inc. v. Shell Oil Co.*, 418 N.W.2d 634, 638 (Iowa 1988). Whether someone is a merchant is a question of fact. *See Prenger v. Baker*, 542 N.W.2d 805, 808 (Iowa 1995) ("The determination of whether a party to a transaction is a merchant is a question of fact."); *Digital Document Techs., LLC v. Freidberg & Parker, LLP*, No. C077910, 2015 WL 7075273, at *3 (Cal. Ct. App. Nov. 13, 2015) ("DDT suggests Freidberg's merchant status is a legal question to be reviewed de novo. We disagree. As in other factual contests, in determining whether a party is a merchant under the UCC we review the facts for substantial evidence and ascertain whether those facts support the judgment.").

"In the decision of whether or not there is a duty, many factors interplay: the hand of history, our ideals of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community 'always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.'" *Trusiani v. Cumberland & York Distribs., Inc.*, 538 A.2d 258, 261 (Me. 1988) (citation omitted). I acknowledge the majority raises a compelling policy argument regarding the purpose of the implied warranty. The majority seems to conclude the implied warranty should be imposed to protect consumers purchasing a home. I conclude the implied warranty should be imposed on persons in the business of building homes to hold them accountable for their product. In almost all cases, the subtle distinction between the two views is immaterial; the result would be the same. This case happens to be the

outlier where the distinction matters. I cannot adopt a pure consumer-protection approach, however, because in my view it creates the potential for ever-expanding liability to innocent homeowners. Consider, for example, a person who builds a home for herself and lives in it for several years. Our hypothetical homeowner then decides to sell the home. If the primary purpose of the warranty is consumer protection, the hypothetical homeowner should be subject to the implied warranty. I cannot go that far. In my view, whether the person constructing the home is in fact a builder-vendor is dispositive of the issue. The Morrisseys are not "experienced builders" and cannot be held liable on a theory of implied warranty of workmanlike construction.

For the foregoing reasons, I respectfully dissent from the resolution of the Sokols' claim for breach of the implied warranty of workmanlike construction. I would affirm the judgment of the district court in all respects.